[No. 20000.   Department Two.   October 25, 1926.]

THE STATE OF WASHINGTON, *Appellant*, v. WASHINGTON TUG AND BARGE COMPANY, *Respondent*.[1]

[1] CARRIERS (2)—WHO ARE COMMON CARRIERS—TOWBOAT COMPANIES. Under Rem. Comp. Stat., § 10344, declaring "towboats" operated "for the public use in the conveyance of persons or property for hire over or upon the waters within this state" to be common carriers, a towboat company is engaged in a public use, where it advertised for and solicited business and performed and rendered services for hire within the field of its operations, for the public generally; and it is immaterial that, in each case of service, there was an express contract entered into prior to the rendition of the service.

Appeal from a judgment of the superior court for Thurston county, Wilson, J., entered December 30, 1925, upon findings in favor of the defendant, in an action by the state to recover penalties, after a trial on the merits to the court. Reversed.

*The Attorney General, H. C. Brodie, Assistant,* and *L. L. Thompson,* for appellant.

*Stratton & Kane,* for respondent.

MAIN, J.—By this action, the state sought to recover penalties because the defendant did not charge for services rendered by it in accordance with the tariff on file with the department of public works. In the complaint there are eleven causes of action separately

[1]Reported in 250 Pac. 49.

stated. During the trial, two of these were dismissed by the state. The trial to the court without a jury proceeded upon the other nine causes and resulted in findings of fact, conclusions of law and a judgment dismissing the complaint as to all causes of action. From this the state appeals.

The respondent was engaged in the business of operating tow boats, tugs, scows, barges and lighters in the conveyance of property for hire over and upon the waters of Puget Sound and the waters adjacent thereto. Its place of business from which the towboats were dispatched was in Seattle. As stated, the action was one to recover penalties. The respondent, for services rendered, at times charged the tariff rate, other times more, and sometimes less. It claims to be a private carrier and therefore not bound by the tariff rate.

[1] The question is whether the respondent was a public or private carrier. This is largely a question of fact or, as in this case, a conclusion from the facts which are not in serious dispute. The question is not whether the respondent was a public carrier at common law but whether it comes under Rem. Comp. Stat., § 10344, which provides that a vessel which includes towboats, tugs, scows, barges and lighters shall be a common carrier when

". . . operated for the public use in the conveyance of persons or property for hire over and upon the waters within this state . . ."

To make the question more specific, it is whether the respondent was operating its towboats, etc., "for the public use."

That the service was rendered and for hire is admitted. The evidence shows that the business of the respondent was conducted in this manner. In its office at Seattle, there was what was called a dispatcher whose duties were to receive applications for service and

furnish the equipment. If the service desired was a matter of consequence, it was submitted to the manager. The company had solicitors who went about the waterfront calling upon their customers and looking for business. These solicitors did not have the power to make contracts, but when business was obtained, it was submitted to the dispatcher and, as said, if it was a matter of some consequence, was in turn submitted to the manager.

A witness called by the state who was formerly the dispatcher for the respondent, in part, testified:

"Q. While you were employed, did the defendant here have solicitors employed to solicit business for this tugboat company? A. Yes. Q. Were these solicitors employed all the time? A. Well, they were employed all the time; not all the time, possibly, as solicitors. There was other work to which they were assigned. Q. Do you know what their duties were as solicitors? A. Well, in a general way to call on the trade and get business, I presume, follow up leads. Q. Soliciting business from the general public? A. Well, whenever there was prospective business, I would say."

The same witness further testified:

"Q. During your employment, did you ever receive orders from the defendant to take work only from certain specific individuals? A. I did not. Q. Was it your understanding that the work would be done for any that might apply? A. Yes."

An officer of the company called as a witness by the respondent testified in part as follows:

"Q. Mr. Duncan, has the Washington Tug & Barge Company solicitors on the waterfront? A. Yes. Q. Soliciting business? A. Certain business, yes. Q. This business for its tugs, barges and lighters? A. Yes."

The same witness further testified:

"Q. You do go after all the ships' business, don't you, towing ships? A. No. Q. You have a call flag,

don't you? A. Yes. Q. You wouldn't refuse a call, would you, unless it involved extra risk? A. We wouldn't refuse a call? Q. Yes. A. If the business was desirable we would not. Q. What would you call undesirable business? A. Business going into dangerous waters, dangerous waters, where the question of collection was involved, where there was a hazard to the towboat performing the service, or if we had other work for the towboat and couldn't spare it for that job."

Referring again to the solicitors, he said:

"Q. And the solicitors aren't restricted to soliciting business from some particular persons, are they? If a nice job comes up, they are supposed to go after it, aren't they? A. Yes, sir."

During the year 1922 the respondent carried an advertisement in the Seattle telephone directory which contained this:

"TUGS SCOWS BARGES
'Anytime—Anywhere'
"Alaska, Coastwise, Local"

About two years before the present action was instituted, "Anytime—Anywhere" was eliminated from the advertisement. There was inserted in its place "Private carrier." After this, the business was conducted in the same manner as before.

The respondent did not tow boom sticks, but at times had towed logs. Aside from this limitation, it seems accurate to say that it was engaged in a general towing business. In fact, the officer whose testimony has already been referred to testified, referring to the business of the company as a jobbing business, that it was carried on largely as was that of other towboat companies. He said:

"Q. Your jobbing business, the business you describe as jobbing is the same as carried on by all these other towboat companies, isn't it? A. Largely."

From the foregoing, it appears to us that it must be found that the respondent held itself out in its dealings and course of business with the public as being ready and willing for hire to perform the services rendered by it and within the field of its operations for the public generally. The test, as stated in Hutchinson on Carriers (3d ed.), vol. 1, p. 44, § 49, as to whether a carrier is public or private, is this:

"The criterion by which it is to be determined whether he belongs to the one class or the other is generally considered to be, whether he has held himself out or has advertised himself in his dealings or course of business with the public as being ready and willing, for hire, to carry particular classes of goods for all those who may desire the transportation of such goods between the places between which he professes in this manner his readiness and willingness to carry. If he has done so, he is of course to be regarded as a common carrier; but if not, he will be treated only as a private carrier for hire."

The fact that the respondent declined to render services when the financial responsibility of the proposed customer was not satisfactory or the service required involved undue hazard does not make it a private carrier. In *Terminal Taxicab Co. v. Public Utilities Comm. of District of Columbia,* 241 U. S. 252, it was said:

"The next item of the plaintiff's business, constituting about a quarter, is under contracts with hotels by which it agrees to furnish enough taxicabs and automobiles within certain hours reasonably to meet the needs of the hotel, receiving the exclusive right to solicit in and about the hotel, but limiting its service to guests of the hotel. We do not perceive that this limi-

tation removes the public character of the service, or takes it out of the definition in the act. No carrier serves all the public. His customers are limited by place, requirements, ability to pay and other facts. But the public generally is free to go to hotels if it can afford to, as it is free to travel by rail, and through the hotel door to call on the plaintiff for a taxicab. We should hesitate to believe that either its contract or its public duty allowed it arbitrarily to refuse to carry a guest upon demand. We certainly may assume that in its own interest it does not attempt to do so. The service affects so considerable a fraction of the public that it is public in the same sense in which any other may be called so.''

Except in one respect, which will be hereinafter referred to, this case in all essential particulars is controlled by *Cushing v. White,* 101 Wash. 172, 172 Pac. 229, L. R. A. 1918F 463. There it was held that owners of automobiles driven for hire at so much per hour or trip, having fixed stands for prospective customers, and transporting passengers from place to place, although without any fixed routes, schedules or rates, and reserving the right to refuse transportation, were common carriers and subject to regulation as such. In that case there is an exhaustive review of the authorities, which need not here be repeated, and after concluding the review it was said:

''Authorities to the same effect may be cited indefinitely; but, from the foregoing, it is manifest that a common carrier is one whose occupation is the transportation of persons or things from place to place for hire or reward, and who holds himself out to the world as ready and willing to serve the public indifferently in the particular line or department in which he is engaged; the true test being whether the given undertaking is a part of the business engaged in by the carrier which he has held out to the general public as his occupation, rather than the quantity or extent of the business actually transacted, or the number and character

of the conveyances used in the employment. On the other hand, if the undertaking be a single transaction, not a part of the general business or occupation engaged in, as advertised and held out to the general public, then the individual or company furnishing such service is a private and not a common carrier. In either case, the question must be determined by the character of the business actually carried on by the carrier and not by any secret intention or mental reservation it may entertain or assert when charged with the duties and obligations which the law imposes.

"An analysis of the findings of the lower court discloses that appellants' calling is characterized by the following features: (a) they are engaged in what is known as the automobile rent business; (b) each of them owns and operates a motor propelled vehicle for hire, either at a charge of so much a trip or so much per hour; (c) each has a fixed stand or place where his car is available to prospective customers during many hours of the day and night; and (d) they transport passengers from place to place. Here we have carriers engaged in transporting persons for hire as a business or occupation, and impliedly and practically holding themselves out to the public as ready and willing to serve indiscriminately all who may desire the use of their facilities. The fact that they have no fixed schedule of charges, do not operate over definite routes, do not upon all occasions load the car to its full capacity, and reserve the right to refuse to transport passengers whether their automobile is engaged or not, is wholly immaterial; their character is determined by their public profession, not by undisclosed reservations or secret intentions."

There, the service was being rendered by a vehicle which operated upon streets and highways. Here, the service is rendered by towboats, barges, etc., which operate upon the water. The fact that one operates upon the water and the other upon the land cannot make any difference as to the applicable rule of law. It is true in the present case, as it was in that case,

that the officers testified that they reserved the right to reject any and all business, but as there pointed out the question must be determined by the character of the business actually carried on and not by the secret intention or mental reservation's of the owners or operators.

In the present case, there is this feature which does not appear in the *Cushing* case, *supra*. Here the evidence was that for the service rendered there was an express contract, usually oral, made in each case prior to the rendition of the services. This, however, does not make the respondent a private carrier. In *Producers' Transp. Co. v. Railroad Commission of State of California*, 251 U. S. 228, it was said:

"A common carrier cannot by making contracts for future transportation or by mortgaging its property or pledging its income prevent or postpone the exertion by the State of the power to regulate the carrier's rates and practices. Nor does the contract clause of the Constitution interpose any obstacle to the exertion of that power."

In *Chicago & E. I. R. Co. v. Chicago Heights Terminal Transfer R. Co.*, 317 Ill. 65, 147 N. E. 664, it was said:

"In this case the terminal company is engaged in the transportation and carriage of goods for hire. The mere fact that it has a contract in which the manner of rendering the service and the compensation therefor were specified in nowise changes the character of the service rendered. It was the service of a common carrier, and, this being true, the terminal company was subject to all rules and regulations to which common carriers are subject, including the provisions of the Interstate Commerce Act."

The respondent says that, since the trial court found that it was a private carrier and did not operate its properties for the public use, this court should

not disturb that finding.  This is not a case where the trial court has found an ultimate fact where the evidence was conflicting, but rather is a case as to what inference should be drawn from facts where the evidence thereon is not in serious dispute.  The trial court in such a case is in little, if any, better position than this court to draw the correct conclusion.  That the legislature had the power of regulation, if in fact the respondent was operating its property for the public use in the conveyance of property for hire over and upon the waters within this state, was determined in the case of *State ex rel. Stimson Timber Co. v. Kuykendall,* 137 Wash. 602, 243 Pac. 834.  It thus appears that we are not in accord with the trial court upon the correct inference to be drawn from the facts.  From this it follows that the judgment cannot be sustained. Whether, however, any of the particular defenses that were interposed to any of the causes of action are good, we do not here discuss or determine.  They were not discussed in the briefs and it would be manifestly unfair to decide those questions without giving the parties an opportunity to present their views. In any event these questions would more properly arise after the judgment of the superior court shall have been entered.

The judgment here involved will be reversed, and the cause remanded with direction to the superior court to enter a judgment as herein indicated.

TOLMAN, C. J., PARKER, MACKINTOSH, and MITCHELL, JJ., concur.