**CONTRACT STEEL CARRIERS, Inc.,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.
**Civ. A. No. 1634.**

United States District Court,
N. D. Indiana, Hammond Division.
Jan. 28, 1955.

Burchmore, Good & Bobinette, Chicago, Ill., Tinkham, Beckman & Kelly, Hammond, Ind., for plaintiff.

Stanley W. Barnes, Asst. Atty. Gen., James E. Kilday and John H. D. Wigger, Sp. Assts. to Atty. Gen., Washington, D. C., Phil M. McNagny, Jr., U. S. Atty., Fort Wayne, Ind., for defendant United States.

Edward M. Reidy, Gen. Counsel, C. H. Johns, Asst. Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

Before LINDLEY, Circuit Judge, and SWYGERT and PARKINSON, District Judges.

LINDLEY, Circuit Judge.

This is an action to set aside an order of the Interstate Commerce Commission, Division 5, entered on January 20, 1954, in an adversary proceeding, upon adjudication by the Commission that plaintiff, an authorized contract carrier, was conducting unauthorized operations as a common carrier. Plaintiff was ordered to cease and desist from such operation and to report to the Commission the details of its compliance on or before March 15, 1954. The matter was held open for the latter purpose. Plaintiff's petition for reconsideration, filed March 12, 1954, was denied on July 30, 1954. The complaint at bar was filed on August 19, 1954. The effective date of the Commission's order has been stayed to February 24, 1955, to allow time for the court to dispose of this cause.

Plaintiff, Contract Steel Carriers, Inc.,[1] holds authority to operate as a contract carrier by motor vehicle, in interstate commerce, of steel articles, from, so far as here pertinent, the Chicago commercial zone to points in Illinois and Iowa. The proceeding before the Commission was initiated by a complaint filed by Motor Ways Tariff Bureau, on behalf of certain of its member carriers, alleging that plaintiff has been, since July 1951, holding itself out to the public and conducting operations as a common carrier of iron and steel products from the Chicago zone to points in Illinois and Iowa without authorization from the Commission. Certain Iowa motor carriers intervened in support of the complaint. Issue was joined on plaintiff's denial that it was conducting operations as a common carrier or in any other manner exceeding the scope of its permit as a contract carrier.

A hearing was had before an examiner who received testimonial and exhibit evidence adduced by Motor Ways and the interveners. The evidence was to the effect that, in May, 1950, plaintiff had only one customer shipping regularly out of the Chicago zone; that by July, 1951,

1. Former name Steel Transportation Company, Inc.

plaintiff had 13 contracts on file with the Commission and that this number had increased to 69 by the time of the hearing; that at the latter time, plaintiff had contracts with all steel receivers of any consequence in Des Moines, Iowa, 16 in number; and that plaintiff had an employee, Willard, at Des Moines, who, a witness was permitted to testify, had said that his duties were those of a solicitor. Plaintiff purchased an advertisement in an industry journal which failed to state that its services were limited to those of a contract carrier. From time to time, plaintiff leased livestock trucks with which to handle iron and steel shipments to Iowa. The intervening common carriers lost business to plaintiff. Plaintiff solicited Quinn Wire & Iron Co. of Boone, Iowa, and executed a contract with it. Plaintiff also solicited the Lennox Furnace Company of Marshalltown, Iowa, but no contract was signed. Plaintiff on one occasion interchanged a shipment with a common carrier. Plaintiff offered no evidence but suggested that the complaint be dismissed for failure to prove a *prima facie* case. Its counsel stated that the advertisement heretofore mentioned was issued without consulting counsel and that, on advice, that type of advertising had been discontinued.

The examiner recommended an order that plaintiff had converted its operations in part to those of a common carrier. Plaintiff objected to the examiner's report and moved to dismiss the complaint on the grounds, *inter alia*, that the complaining parties had failed to sustain the burden of proving a *prima facie* case and that the cause had become moot by reason of changes in plaintiff's operations in respect of each feature complained of by the complaining parties and criticized by the examiner. The motion was supported by an affidavit of plaintiff's president which stated, among other things, that plaintiff's corporate name had been changed to Contract Steel Carriers; that it had ceased advertising except for listings in motor carrier guides which prominently display the designation "Contract Carrier", that no representa-

tive of plaintiff had since the hearing solicited any shipment; that, after a review of its contracts, it had cancelled 13 of them and that every remaining contract provides for and is accompanied by operations requiring specialized service and devotion to the business of the contracting shipper.

The Commission accepted the statements of the affidavit "for such effect as they may have upon * * * carrier's status", except the last relating to the requirement of specialized service in plaintiff's remaining contracts. In rejecting that statement, the Commission referred to the number of contracts still held by plaintiff as refuting any important change in plaintiff's operations. Applying the tests set forth in Craig Carrier Application, 31 M.C.C. 705, as amplified by Division 5 in the Midwest Transfer case, 49 M.C.C. 383, the Commission concluded that the complaint was meritorious, that "defendant's operations are lacking in the degree of individuality and specialization necessary for true contract carriage," and that a cease and desist order should enter.

Plaintiff relies principally upon its assertion that the report and order are based upon an erroneous construction of the statute. Illumination of its argument may justify elaborate quotation from the basic conclusions of the Commission which were entered without reference to the terms of the contracts held by plaintiff and which point up the crux of its argument, to wit:

"Although the facts here are meager in some respects, they reveal a pattern of extraordinary expansion in a period of approximately 8 months and an easy turn-over of contracts thereafter. We believe that there is ample evidence to show that this expansion was brought about, to some extent at least, by indiscriminate solicitation and advertising, among other things. Even subsequent to the cancellation of 13 contracts, some of which have been replaced by others, the number of contracts is deemed inordinate in

*the circumstances here present.* The ultimate test to be applied is the nature of the holding out to the public on the part of the carrier and in the Craig case the Commission found that the claim of the carrier to contract carrier status must be based upon emphasis on individuality and specialization of service.

"As to the degree of specialization in defendant's service or equipment the record is somewhat scanty. It is, nevertheless, established that defendant, on occasions, utilizes leased vehicles which are commonly used in the other direction for the transportation of livestock from farm to market. Clearly these vehicles are not specialized equipment and there is nothing in the record to show that any material portion of defendant's equipment is specialized. While the burden of proof is upon complainant, the defendant has adduced nothing to rebut the testimony and exhibits of record and the evidence as a whole leaves no doubt but that defendant's operations are lacking in the degree of individuality and specialization necessary for true contract carriage. All things considered, we conclude that the complaint is meritorious and that defendant should be ordered to cease and desist from operations which are not those of a true contract carrier as described in the Craig case and discussed in the Midwest Transfer case."

Plaintiff contends that the statutory definitions of common carriers and contract carriers set forth in Section 203 of the Act adopt the common law concept of contract carriage as distinguished from common carriage, namely, that the services must be rendered under individual contracts or agreements individually negotiated with the customer and that the operators must engage in transportation other than as a common carrier, i. e., one who holds itself out to serve the general public on non-discriminatory terms. Conversely, it asserts that the presence or absence of specialization is without statutory warrant as a test of contract carrier status.

In pertinent part Section 203 of the Act, as amended, provides:

"(14) The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, except transportation by motor vehicle by an express company to the extent that such transportation has heretofore been subject to chapter 1 of this title * * *.

"(15) The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) of this section and the exception therein) by motor vehicle of passengers or property in interstate or foreign commerce for compensation." 49 U.S.C.A. § 303(a) (14) and (15).

Clearly this definitive distinction between common carriers and contract carriers is couched in terms of the presence or absence in the carrier's operation of a "holding out to the general public," a common law phrase of art expressive of the public nature of the undertaking of the common carrier and universally adhered to by the courts to test the status under regulation of carriers.

In Terminal Taxicab Co. v. Kutz, 241 U.S. 252, 36 S.Ct. 583, 60 L.Ed. 984, the question was as to the application of the District of Columbia public utility statute to the carrier's operation. The Court held that portion of the carrier's business devoted to furnishing automobiles from its central garage on orders generally received by telephone to be private, not common carriage. In this determination the Court considered the ex-

tensive advertising employed by the carrier and assumed that it would accept any seemingly solvent customer, saying, paraphrased in part, "Still, the bargains are individual" and the charges lack the mechanical fixity prevalent in the use of taxicabs in the other aspects of the carrier's business. 241 U.S. at page 255, 36 S.Ct. at page 584.

In Michigan Public Utilities Commission v. Duke, 266 U.S. 570, 45 S.Ct. 191, 69 L.Ed. 445, the Court held a statute which converted, by legislative fiat, the carrier's activities from those of a contract to a common carrier invalid under the Commerce Clause of the Constitution, art. 1, § 8, cl. 3. The Court adhered to the element of confining one's business to individual contracts as the controlling test of private carriage, saying, 266 U.S. at page 576, 45 S.Ct. at page 192: "He does not undertake to carry for the public and does not devote his property to any public use. He has done nothing to give rise to a duty to carry for others. The public is not dependent on him or the use of his property for service, and has no right to call on him for transportation."

So, too, in Sanger v. Lukens, 9 Cir., 26 F.2d 855, the court reversed a judgment dismissing a complaint seeking to set aside a State regulation which turned on the question whether the plaintiff's activities were those of a private or contract carrier. On the basis of pleadings showing only that the plaintiff's business was the hiring of trucks with drivers for purposes of hauling commodities for others under individual contracts of hiring the court said that it could not be held that the plaintiff was a common carrier.

These cases are exemplary merely and are by no means exhaustive. In each the controlling test was the presence of individual contracts and the absence of a "holding out" to serve the public generally.

Does the statutory standard provided by Section 203(a) (14) and (15) require a different test? The position of the Commission is that contract carrier status depends on the rendition by the carrier of specialized service to the shipper. This position was first announced under the definitive provisions of the 1935 Act in Pregler Extension of Operations, 23 M.C.C. 691, heard on Pregler's application for a contract carrier permit. That statute defined a "contract carrier" as one, not a common carrier, who rendered transport service for hire "under *special and individual contracts* or agreements." (Emphasis supplied.) The Commission construed the italicized phrase as requiring "a special and individual service which is required by the peculiar needs of a particular shipper" as a requisite to a carrier's entitlement to a contract carrier permit. The language of the Commission at 23 M.C.C. at pages 694–695 is pertinent, to wit: "As seen, a contract carrier is not only one who does not come within the definition of a common carrier by motor vehicle * * * but one who also renders a transportation service for compensation 'under special and individual contracts or agreements.' This latter requirement is not merely that the transportation be performed under contract. Whatever the contract or agreement, it must be special and individual. It goes to the subject matter of the contract and means *a special and individual service which is required by the peculiar needs of a particular shipper.*" (Emphasis supplied.)

It is apparent that the emphasized language purports to be an interpretation of the word "special" employed in the Act. The adjective "special" is defined, *inter alia*, as "Regarded with particular favor * * *" and "Containing particulars; detailed; specific;—opposed to general." Websters New International Dictionary (2nd Ed.). Recognized synonyms of the word are "particular, peculiar, specific, individual, concrete." Id. The lexicographer also recognizes the term "special carrier" as employed in legal parlance as synonymous with the term "private carrier." Id. Thus under either of several common definitions of the word, "special," in the statute as applied to contracts may well

mean nothing more than detailed, specifically negotiated or having particularized terms not uniformly applicable to all contracts of carriage. In the statutory reference the word obviously modifies the word contract since the statute neither presumes to refer to any terms of such contract nor to define or limit the classification of shippers on the basis of such terms. It seems to us that under the only reasonable construction of the statutory term, "special contract" means a contract specifically negotiated with the particular shipper, the terms of which may or may not comport with other similar contracts held by the contracting carrier or other carriers of the same classification. This construction becomes more compelling when the fact is considered that contractual relationships are the basis of all carriage for hire. "Special," in the phrase under discussion, distinguishes the personal relationship between the private carrier and each individual shipper from the impersonal relationship of the common carrier to each member of the general public who applies to him for service which he is required by the public nature of his undertaking to render indiscriminately.

The position of the Commission was amplified somewhat in the Craig case, 31 M.C.C. 705. On an application by Craig for a permit to operate as a contract carrier, the Commission stated that the term contract carrier was to be defined by applying the common law test of whether or not there was a "holding out." The so-called secondary test of "specialization" was enunciated as an aid to decision of that ultimate question. The Commission then concluded that "the lack of one or the other forms of specialization above indicated conclusively negatives contract carriage as contemplated by Section 203(b) (15) of the Act." 31 M.C.C. at page 712.

We have some difficulty understanding this reasoning notwithstanding its approval in Doyle Transfer Co. of Glasgow, Ky. v. United States, D.C., 45 F.Supp. 691. The statute speaks of contract carriers, a common law term of such definitive exactness as no longer to be open to interpretation. In Craig, however, the Commission voiced the difficulty of application of such a general test as the presence or absence of a "holding out" within the common law concept to determine status. To bridge this mire of discovered generality, the specialization test was devised, an approach which is so general as to become nebulous. The Commission recognizes that this specialization may take the form of special types of equipment, special training of employees, supplying of related nontransportation services or devotion of a carrier's services to a particular shipper or shippers. Little imagination is needed to break each of these generic categories down into literally dozens of component parts and, perhaps, to add several categories to the list. Clearly this secondary test, so-called, as applied in Craig, is grafted onto the common law concept as an additional requirement, at least, of the status of contract carrier, and may be more accurately construed as abrogating the common law concept in favor of a more restrictive condition precedent to the existence of the status.

"Specialization" had not yet achieved its full growth to manhood. But application of the test reached its greatest height in the Midwest Transfer case, 49 M.C.C. 383, in which it was applied for the first time to the question of the extent of permissive operations within a previously granted permit. The postulate is there asserted that the presence of specialization is evidenced or negated by the number of contracts held and the relative facility with which new contracts are added and substituted without any reference whatever to the terms of the specific contracts held by the accused carrier.

Thus was forged the chain from which the order before us is, in the final analysis, principally suspended, namely, an "inordinate number" of contracts and the facile procurement of new ones negates specialization; absence of specialization denotes a "holding out" to serve the general public and such a holding

out under the common law concept negatives the status of contract carrier.

Analysis of the Pregler and Craig reports reveals, as the Commission hinted in Craig but apparently did not grasp in the earlier case, that these decisions are the result of the view of the Commission that the well-defined common law status of contract carrier, developed case by case to measure and limit the duties and liabilities arising under a specific type of carrier-shipper contract, did not adequately define the comparable relationship which it deemed necessary in order properly to implement the purposes of the Act. Perhaps this view rests on considerations which are peculiarly within the expert function of the Commission and its correctness is, therefore, not open to question by the courts. But we can and do question the means employed to effectuate this position. Dissatisfaction of an enforcement agency with the provision of a statute does not open the legislative act to amendment by administrative decision under the guise of interpretation. If the Commission felt that amendment was necessary or desirable, the plea should have been addressed to Congress. Since we cannot say that the doctrine of specialization logically follows from the application of common law rules to the field of regulation, a subject wholly foreign to that in which the rules were developed, we must conclude that the doctrine is an abrogation of the well understood statutory definition in favor of a much more restricted relationship to comport with the Commission's view of what the statute should say.

Defendants contend, however, that, assuming the specialization doctrine announced in the Pregler case to have been an invalid extension of the statutory definition of contract carriers, Congress must be deemed to have adopted the Pregler rule when the definition section of the Act was thereafter amended. In 1940 paragraphs (14) and (15) of the section were amended to exclude carriers performing certain essentially local services from the coverage of the Act.

The effect of the 1940 amendment was considered in Craig in which the Commission concluded that Congress had thereby adopted the Pregler doctrine. The first basis stated for this conclusion is the general truism of statutory construction that a legislative body in amending a statute is presumed to have had in mind prior construction placed on its language and to have adopted that construction insofar as the language of the original Act is not changed. 31 M.C.C. at page 710. This argument assumes that, except for the express exception created by the 1940 amendment, the language of the definitive provisions remained unchanged. See e. g. Carroll Electric Co. v. Snelling, 1 Cir., 62 F.2d 413; Coca-Cola Co. v. State Board, 25 Cal.2d 918, 156 P.2d 1. However that assumption is not justified. As we have noted, paragraph (15), as amended, defines a contract carrier as one other than a common carrier who "under individual contracts" engages in the transportation of goods for hire. Thus the language of the original statute was changed in a very material respect by deletion of the word "special" therefrom. The effect of this deletion is that the amended definition omits the peg on which the specialization test was hung in Pregler. Even if we assume the Pregler doctrine to be a permissible interpretation of the modifying word "special" in the 1935 Act, elimination of that term from the amended paragraph cuts the ground from under that doctrine.

The second ground stated in Craig to support the conclusion that Congress had adopted the Pregler rule was the fact of passage of the bill after certain statements by the Senatorial Committee reported at 86 Cong.Rec. 11546 that the intent in reporting the bill to the Senate was that the definition of "contract carriers" remained unchanged and that this definition included a requirement of specialization. 31 M.C.C. at page 712. The statute before us is clear on its face: the term "contract carrier" is defined in terms of the well understood common law concept. Ambiguity enters into the pic-

ture only when dragged in to support a departure from that universal concept. Thus, we have no reason to look behind the Act to the legislative history, but, on the contrary, must give the clear expression of Congress' intent its plain meaning.

We are not unmindful of the rule that a regulatory agency is not bound by common law standards of definition in cases where the task of defining a statutory term is delegated to it, N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111, 120–124, 64 S.Ct. 851, 88 L.Ed. 1170, or of the rule that such an administrative interpretation is not a question of law for judicial determination. O'Leary v. Brown-Pacific-Maxon, 340 U.S. 504, 507–508, 71 S.Ct. 470, 95 L.Ed. 483; Gray v. Powell, 314 U.S. 402, 412, 62 S.Ct. 326, 86 L.Ed. 301. However, in the statute before us, Congress has defined the term "contract carriers." Thus the question before us is not merely one of the application of the statute to a particular case, but whether the postulate applied by the Commission represents an unlawful departure from that express statutory definition. That question we answer in the affirmative.

Although what has been said should dispose of this case, the importance of other issues raised by the parties requires some comment. Plaintiff objects that the conclusion that it had been conducting operations as a common carrier is based solely on the number of customers served by it. As we construe plaintiff's position on this point, it has a twofold aspect, (1) that the number of contracts held by a carrier cannot be a determinative fact consistently with the proviso of Section 209(b) of the Act, 49 U.S.C.A. § 309(b), and (2) that its status must be determined on the basis of the terms of the individual contracts held by the carrier.

Section 209(b) which governs the issuance of permits to contract carriers contains a proviso "That no terms, conditions, or limitations shall restrict the right of the carrier to substitute or add contracts within the scope of the permit, or to add to his or its equipment and facilities, within the scope of the permit, as the development of the business and the demands of the public may require." 49 U.S.C.A. § 309(b).

Defendants rely on the Commission's interpretation of that Section in its Midwest Transfer report wherein it is stated that the Commission has no authority to limit the contracts of an authorized carrier to any specific number, "But, the statutory guarantee of a contract carrier's right to add to or substitute contracts does not mean that a contract carrier may add so many contracts or substitute them so freely as to demonstrate that its service is available to the public and has been converted into what is in fact a public or common carrier service." 49 M.C.C. at page 404. The Commission concluded that it could, if need be, require a reduction of the number of contracts held to effectuate discontinuance of such an unlawful operation.

Section 209(b) has not been judicially construed in connection with the definition sections. The provision was not mentioned in Doyle Transfer Co. of Glasgow, Ky. v. United States, D.C., 45 F.Supp. 691, in which the District Court for the District of Columbia sustained the specialization test as valid when applied in a proceeding on a permit application. Application of the section was in issue in American Trucking Associations v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337, which was an attack upon regulations adopted by the Commission to control the interchange and leasing of equipment. In answer to the plaintiff's assertion that the regulations infringed the plaintiffs' rights under Section 209(b) to augment its equipment, the Court said, 344 U.S. at page 316, 73 S.Ct. at page 317: "The provisos in question are not to be read as blanket restrictions on the Commission's regulatory powers; they are aimed at the restrictions on the increase in volume of traffic through acquisition of additional vehicles. Clearly, a numerical

limitation would be invalid, but the Commission's refusal to permit carriers to secure and use equipment which does not satisfy its safety, loading, and licensing rules would not. * * * We think it equally apparent that regulation of * * * the use of nonowned vehicles is not a 'limitation on the addition of more vehicles of the authorized type'. [Crescent Express Lines, Inc., v. United States] 320 U.S. [401] at page 409, 64 S.Ct. [167] at page 171 [88 L.Ed. 127]."

The quoted language is pertinent in our consideration of the clause before us. The proviso limits both the right to substitute and add contracts and the right to add equipment "within the scope of the permit". Admittedly this section does not empower the Commission to confine the number of contracts a carrier may hold within a definite limit. Midwest Transfer, supra, at page 404. In other words, the number of contracts held is not the controlling consideration in a proceeding of this nature. "Within the scope of the permit" must be construed as a term of reference definitive of the provisions which may be included in contracts of carriage within the bounds of the permissible conditions imposed by the permit. The only alternative to this interpretation is, we believe, the unacceptable one that this proviso is meaningless; that every contract carrier is subject to a nebulous delegation of power to the Commission to restrict at its whim the scope of his business without regard to whether the particular contracts of carriage comport with his grant of authority to operate.

Furthermore, such an alternative would have the deleterious effect of reducing the complaining party's burden of making a case to any proof which would convince the Commission that the accused carrier had "too many contracts" too easily substituted to bring into play a presumption of invalidity of such carrier's operation.

Defendant contends, however, that the order before us does not rest solely on the number of contracts held by complainant.

A careful analysis of the report refutes this contention. For purposes of its decision the Commission assumed the statements made by affidavit that objectionable features of advertising, solicitation and interchange with common carriers had been discontinued to be true for such effect as they might have on the decision. The remaining evidence of violation of authority lay in the testimony that certain common carriers had lost business to plaintiff and in the existence of some 60 odd contracts.

We agree with the view expressed in Swedesboro Transp. Co. v. United States, D.C., 45 F.Supp. 33, at page 34, that the nature and terms of the contracts held by plaintiff are "most important elements in determining whether the carriage under consideration be contract or common." These contracts were not even in evidence before the Commission. Defendant's contention that plaintiff's failure to appear to defend denied the Commission access to the contracts is wholly wanting in merit in view of the fact that these contracts were on file with the Commission and in view of the Commission's power to compel their production by subpoena under Section 12 of the Interstate Commerce Act, 49 U.S.C.A. § 12(2).

Even if the order before us were based on a proper interpretation of the statute, it still must be set aside for vagueness. Plaintiff is ordered "to cease and desist * * * from the operations as a common carrier by motor vehicle which it is found in said report now to be conducting without appropriate authority * * *" and to inform the Commission on or before a day certain of "the manner and details of its compliance" therewith.

Since no specific findings were made by the Commission, we must look to its ultimate conclusions to measure the scope of plaintiff's operations which the order purports to enjoin. Such an analysis reveals that the order rests on the conclusions that plaintiff held an "inordinate number of contracts" and that plaintiff's business has enjoyed "extraordinary ex-

pansion" which was brought about in part at least "by indiscriminate solicitation." Thus plaintiff must act at its peril. Whatever it does, short of abandoning its business, is subject to a Commission edict that its business is still inordinate or the result of indiscriminate solicitation.

In short, an order of the Commission must be sufficiently detailed to enable the accused party to determine what he must do to rectify an adjudicated unlawful practice. We note, in passing, that the right of reasonable solicitation of contracts within the scope of a granted permit would seem to be a necessary part of the right guaranteed by Section 209 (b) to negotiate new contracts. The order before us leaves all phases of plaintiff's operations subject to the caprice of the Commission.

For the foregoing reasons the order is set aside and the proceeding remanded to the Commission for such further proceedings as the Commission may care to take not inconsistent with the views expressed herein.