The HOME INSURANCE COMPANY,
Appellant,

v.

Thomas H. RIDDELL, Jr., and Charles F.
Riddell, Appellees.

No. 16718.

United States Court of Appeals
Fifth Circuit.

Jan. 21, 1958.

William O. Carter, Jr., Jackson, Miss., Armstead F. Clay, Memphis, Tenn., Byrd, Wise & Smith, Jackson, Miss., and Fitzhugh & Clay, Memphis, Tenn., of counsel, for appellant.

Thomas H. Watkins, William F. Goodman, Jr., Jackson, Miss., L. G. Spivey, Canton, Miss., for appellees. Watkins & Eager, Jackson, Miss., and Ray, Spivey & Cain, Canton, Miss., of counsel.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The sole question is whether Riddell, the motor Carrier, while transporting 60 bales of cotton belonging to Ed Linn, the Shipper,[1] on an interstate journey from Arkansas to Alabama under a contract made in Mississippi was doing so as a common carrier or as a private-contract-carrier. Actually, it is further narrowed to the simpler one: is the District Court's finding of a contract-private carrier status clearly erroneous, Fed. Rules Civ.Proc. rule 52(a), 28 U.S.C.A.

It is ironic that in a field now so thoroughly fenced in by state and federal legislative declarations of policy, in the journey we make for solution, we must work with ancient markers whose general fitness is reflected by their adaptability to the changing world of commerce and transportation. Indeed, at one point in the trip as we leave the broad superhighway with its temptations toward high compression freewheeling adjudication and proceed down the narrow one-way lane of Erie [Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188], we must pay at least a wayside stop to consider whether a Mississippi mule and wagon decision fixes the law for the internal combustion day as well. This is so because, while it was an interstate journey which freed the transportation from Mississippi[2] regulation and subjected it conversely to potential federal control, the federal legislative scheme expressly exempts, under Section 203(b)(6), "motor vehicles used in carrying * * * agricultural commodities * * * if such motor vehicles are not used in carrying any other property * * * for compensation," 49 U.S.C.A. § 303(b)(6), which would, of course, include cotton. East Texas Motor Freight Lines, Inc., v. Frozen Food Express, 351 U.S.

---

1. Appellant, plaintiff below, is Home Insurance Company who, after payment for a total loss by fire under a cargo policy issued to Linn, the Shipper, asserts its subrogation rights. It is now conceded that unless the Carrier had the insurer liability of a common carrier, the Shipper should not recover.

2. Mississippi has a typical intricate statutory structure for regulation and control of Motor Common Carriers, Restricted Common Carriers, Contract Carriers and Private Carriers. Miss.Code, Ann., Motor Carriers, §§ 7632–7687; see also Miss.Code Ann. § 9352–81.

   While not directly pertinent here, the Interstate Commerce Commission had issued to Riddell Permit No. MC 112355 as a Contract Carrier, 49 U.S.C.A. § 309, for the interstate transportation of "Animal and poultry feed, meals, fertilizer and fertilizer ingredients, and empty containers, used in the transportation thereof, over irregular routes, Between all points in Alabama, Arkansas, Louisiana, Mississippi, and Tennessee." In MC–2346, the Mississippi Public Service Commission issued a permit to the Carrier "authorizing the transportation of property in interstate commerce only over the same route or routes in Mississippi that have been or may be authorized in Mississippi, by the Interstate Commerce Commission."

49, 76 S.Ct. 574, 100 L.Ed. 917; Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910.

It must be obvious though that while these ancient road signs do point the way, they must be read with care since statutes, state and federal, have now and then raised[3] dead-end barricades or detour markers.

Riddell was a man of many pursuits. He was a Mississippi farmer, apparently assisted his father in the operations of a plantation, was a livestock feeder, auctioneer, operated a gin, and in conjunction with his brother carried on a trucking service under the name of Riddell Truckline. The trucks employed in this were those used by Riddell in the transportation incident to these other numerous activities. While his own business activities had first call on his trucks, it is plain that even though trucking was not his principal occupation, it was an important phase of his enterprise. In the year of this transportation, he had grossed approximately one hundred twenty-five thousand dollars. Moreover, he actively solicited the transportation business of shippers of exempt agricultural commodities including the movement of livestock and, more pertinent here, the carriage of cotton for numerous specified cotton firms, many of national prominence, from warehouses, gins, or compresses for delivery to mills and others throughout the Southern states.

But this mere willingness to carry, indeed this anxious cultivation of potential business, does not itself irrevocably stamp the resulting service as common carriage. For whatever might have been the incidence of these physical activities under the ancient standards, the law today must reckon with the intense development of three distinct types of motor carriers—Common Carriers, Contract Carriers, and Private Carriers of goods owned by the carrier. In each type the goods, the voyage, the route, the origin, the destination, the facilities[4] used may be identical. The distinction in status then comes about from the nature of the holding out.

Here the factor deemed of decisive significance was the uncontradicted *fact* that Riddell conditioned his willingness to carry upon the negotiation of a satisfactory price.[5] He had no tariffs or any schedule of rates or charges. In arriving at an agreeable rate or price, or in determining whether he would accept a shipment at a tendered rate, he, as any other unregulated free enterpriser, took into account such elements as the amount of cargo offered, previous relationships with the shipper, whether the shipper provided cargo insurance, the nature, duration and time of the trip, availability of equipment to meet his own needs or

3. For example, the traditional concept is that the common carrier holds himself out to carry *all* goods (for which his conveyance is suited) tendered by all shippers. Now an interstate exempt carrier, common or contract, may lawfully carry only commodities which have a Section 203(b) (6) exemption. The quality of his holding out is not affected by restricting commodities to those which he may lawfully carry or the converse exclusion of those which would make him a lawbreaker.

4. E. g., the ownership, as such, of three tractor-trailers might be in a single person leasing to the common carrier, the contract carrier, and the private shipper carrier. See American Trucking Association v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337.

5. Actually, it is undisputed here that Linn first offered the shipment at a specified rate which Riddell rejected. A day or so later, influenced by Shipper's statement that he had insurance, a rate was apparently agreed upon and Riddell undertook to furnish the transportation. If, as subrogee Home gets its rights through the feet of the Shipper in whose shoes it stands, it must take his mouth as well, and here Linn, after acknowledging that several times he had tendered shipments which Riddell had rejected, or on which they failed to get together on an agreed price, categorically testified that he "certainly didn't * * * understand that [he] had a legal right to command the use of * * * Riddell's trucks any time [he] wanted to * * *."

other transportation commitments and the like. In the exercise of this managerial judgment, he frequently turned down proffered business.

■ The salient characteristic of a common carrier is that "He must be engaged in the business of carrying goods for others as a public employment, and must hold himself out as ready to engage in the transportation of goods for persons generally * * * [and] holds himself out as ready to engage in the transportation of goods for hire as a public employment, * * * and * * * undertakes to carry for all persons indifferently * * *," 13 C.J.S. Carriers § 3. And to state it conversely, those who " * * * do not hold themselves out as willing to serve the public indiscriminately, are not common carriers; * * *," 13 C.J.S. Carriers § 8. Hornsby v. Logaras, 210 Miss. 512, 49 So.2d 837: As "The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently * * *," 9 Am.Jur. Carriers, § 4, p. 431, there has been no such holding out if, in the regular operation of that business, the carrier by act and deed, with or without words, claims to and exercises the right to fix specific rates in each individual case basing the charges not on a regular schedule (whether formally filed as tariffs or otherwise), but on contemporary judgment of the moment. For

this is an effectual announcement that the carrier will discriminate, will undertake transportation differently, not indifferently.

■ Subject to statutory restrictions, state or federal, concerning performance of a transportation service none of which are applicable here, a person has the right to engage in the business of a private carrier. He asserts that right when, seeking all potential business as avidly as any other businessman desirous of a profit, it is yet his practice to treat each individual shipment on a separate basis and accept or reject it as wished and on terms and at rates satisfactory to him at the time.

To this the Shipper counters with great ingenuity and a thoroughly workmanlike brief that exhaustively treats with all of the subsidiary characteristic marks of a common carrier. He contends that whether a person actually charges different rates is no consequence. For if he is a common carrier,[6] such discrimination is a violation of his duty and the nature of the charges to be collected flows as a legal incidence from the underlying factual determination of status as a common or contract carrier. Nor, he insists, may such a carrier escape the status or obligations of a common carrier by an undisclosed, secret reservation [7] of a right to reject proffered shipments.

6. The Shipper, asserting that the fact that a carrier does not publish a tariff and that agreements as to price are made in each case with the shipper does not prevent the carrier from being a common carrier, presses these cases: James v. Public Service Comm., 116 Pa.Super. 577, 177 A. 343; Craig v. Public Utilities Comm., 115 Ohio St. 512, 154 N.E. 795; Collier v. Langan & Taylor Storage & Moving Co., 147 Mo.App. 700, 127 S.W. 435; Jackson Architectural Iron Works v. Hurlbut, 158 N.Y. 34, 52 N.E. 665; Keystone Warehousing Co. v. Public Service Comm., 105 Pa.Super. 267, 161 A. 891; Lloyd v. Haugh & Keenan Storage & Transfer Co., 223 Pa. 148, 72 A. 516, 21 L.R.A.,N.S., 188; Harrison v. Roy, 39 Miss. 396; Cushing v. White, 101 Wash. 172, 172 P. 229, L.R.A.1918F,

463; State v. Washington Tug & Barge Co., 140 Wash. 613, 250 P. 49.

7. The Shipper relies on these cases: Cushing v. White, 101 Wash. 172, 172 P. 229, L.R.A.1918F, 463; Claypool v. Lightning Delivery Co., 38 Ariz. 262, 299 P. 126, 128; Stoner v. Underseth, 85 Mont. 11, 277 P. 437; State v. Washington Tug & Barge Co., 140 Wash. 613, 250 P. 49; Lloyd v. Haugh & Keenan Storage & Transfer Co., 223 Pa. 148, 72 A. 516, 21 L.R.A.,N.S., 188; Davis v. People, 79 Colo. 642, 247 P. 801; James v. Public Service Comm., 116 Pa.Super. 577, 177 A. 343; Keystone Warehousing Co. v. Public Service Comm., 105 Pa. Super. 267, 161 A. 891.

But of course this practice was not secret. Indeed, this Shipper knew this from firsthand experience, see note 5, supra.

The trouble with this merry-go-round analysis is that, in assuming the existence of a status which such evidence refutes, it ignores altogether one of the basic, realistic business manifestations of a purpose to preserve an independence in the choice of customers and the selection of contracts—the willingness to perform only on terms and conditions then and there negotiated. There is no more positive way of revealing the determination not to take on the obligations of a public utility, not to serve without discrimination, not to serve indifferently. If it is without significance in the underlying factual determination of status, what is to keep every exempt interstate contract carrier from becoming, at some undeterminable time, an unwilling common carrier?[8]

Whatever may be the scope of our review as to this fundamental finding, Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217, where the disputed inference is drawn from evidentiary facts that are largely uncontradicted,[9] we think that the District Court had ample basis for its finding, and we cannot capsize it as clearly erroneous, nor, if we consider it open to us here would we reach an opposite fact finding.

We agree also with the District Court's conclusion of law that one who is a contract carrier in fact, i. e., not a common carrier, is a contract carrier in law. Riddell was not therefore, a common carrier as claimed. Beatrice Creamery Company v. Fisher, 291 Ill. App. 495, 10 N.E.2d 220; Meyer v. Rozran, 333 Ill.App. 301, 77 N.E.2d 454; Senters v. Ratliff's Administrator, 278 Ky. 290, 128 S.W.2d 724; Parker v. Stewart, 296 Ky. 48, 176 S.W.2d 88.

Nor confining ourselves to Mississippi law on the supposition that the place of making the interstate contract would be controlling, do we consider that the ancient case of Harrison v. Roy, 39 Miss. 396, imposing common carrier liability on one who carried cotton in a mule-drawn wagon under an 1856 receipt "to deliver in like good order" or the one of even greater vintage, Powell v. Mills, 30 Miss. 231, for silks damaged while being carried on a stagecoach, either compel or permit a different answer. We think these cases dealt with the usual problem of fact on the status of the carrier. If as the Shipper seems finally to contend, these cases show that it is enough if the person customarily carries goods and makes some charge for it so that the na-

8. The consequence cannot be avoided by the form of the contract, i. e., written rather than oral, for that is insignificant; nor by some unknown *ad hoc* limitation from time to time as each jury or judge looks at the situation, in the number of contract shippers served, for the number of individual contracts or active intense solicitation of new contract shipments affords no basis for a determination that the carrier is a common, not a contract carrier. Contract Steel Carriers v. United States, D.C.Ind., 128 F.Supp. 25, affirmed 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482. See Amendments August 13 and 22, 1957, Public Laws 85–124 and 85–163, § 2, 71 Stat. 343 and 411 to Sections 309 and 318, 49 U.S.C.A. §§ 309, 318.

9. The Shipper cites: Crutcher v. Joyce, 10 Cir., 146 F.2d 518; In re Chicago & N. W. R. Co., 7 Cir., 110 F.2d 425; Stevenot v. Norberg, 9 Cir., 210 F.2d 615; St. Louis Union Trust Co. v. Finnegan, 8 Cir., 197 F.2d 565; Brown v. Cowden Livestock Co., 9 Cir., 187 F.2d 1015; Fritz v. Jarecki, 7 Cir., 189 F. 2d 445; Chandler v. United States, 7 Cir., 226 F.2d 403.

And to these may be added several of our own, e. g., Fahs v. Taylor, 5 Cir., 239 F.2d 224, 226: "We have repeatedly held that where there is no dispute as to the basic evidentiary facts (and there is none here) and nothing remains but for the trial court to apply the process of reasoning to achieve a correct interpretation of the legal significance of the evidentiary facts, such conclusion as the trial court reaches as an 'ultimate fact' is subject to review, not as we review a finding of fact, but freed of the restraint of the 'clearly erroneous' rule. The clearest statement of this principle is contained in Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217, 219. It was reiterated in Goldberg v. C. I. R., 5 Cir., 223 F.2d 709, and most recently applied in Consolidated Naval Stores Co. v. Fahs, 5 Cir., 227 F.2d 923, 925." And see, United States v. Munro-Van Helms Co., 5 Cir., 243 F.2d 10, 12.

ture of the holding out has no significance, we think that as Erie lights, they are weak indeed. Since that time, Mississippi, along with others, has established a public policy, see note 2, supra, which reveals that to engage in transportation and to make a charge for the service does not supply the easy, invariable mechanical answer. Indeed, that is but the starting point to determine whether the person is a Common Carrier, Contract Carrier, Restricted Common Carrier or Private Carrier.

Affirmed.