United States Court of Appeals,

Fifth Circuit.

No. 91-4904.

Roger E. WOOLSEY, Petitioner,

v.

NATIONAL TRANSPORTATION SAFETY BOARD and Federal Aviation Administration, Respondents.

June 23, 1993.

Petition for Review of an Order of the National Transportation Safety Board.

Before GOLDBERG, JONES, and DeMOSS, Circuit Judges.

GOLDBERG, Circuit Judge:

We embark on a journey into the lofty area of aviation safety regulation. Previous navigators have left powerful beacons along the way to guide us. The law in this area is not too far up in the air. We may encounter a few clouds of doubt, but they will dissipate. We anticipate a smooth flight before descending to our final destination.

Roger E. Woolsey appeals an order of the National Transportation Safety Board ("NTSB") which affirmed the FAA's revocation of his commercial pilot's certification due to his failure to comply with the safety requirements for pilots operating aircraft for a common carrier under Part 135 of the Federal Aviation Regulations ("FAR), 14 C.F.R. § 135. Neither the Federal Aviation Act of 1958, 49 U.S.C.App. § 1301 et seq., nor the regulations promulgated thereunder, define the term "common carrier." Woolsey disputes the definition used by the FAA and the NTSB. He claims that the aircraft he piloted were not operated in common carriage, and hence that the less stringent safety requirements of FAR Part 91 should have been applied by NTSB. He also contends that the NTSB erred in affirming the administrative law judge's admission into evidence of certain documents pertaining to the marketing efforts of Prestige Touring, Inc. ("PTI"). We find that the NTSB's interpretation of the term "common carrier" as applied to air carriers was correct, and that the fact finding of the NTSB was supported by substantial evidence even without reference to the documents Mr. Woolsey sought to have excluded.

Roger E. Woolsey is president of Prestige Touring, Inc. ("PTI"), a small air carrier which specializes in transporting musicians. Prior to entering into an agreement to transport the country musician Reba McEntire for a minimum of several hundred hours per year, PTI marketed itself primarily to rock musicians, with whom it had at least twenty-five contracts in 1990.[1] Although Woolsey claims that PTI makes "individualized decisions in particular cases whether and on what terms to serve ... [and] does not furnish transportation indiscriminately, but furnishes it only to those with whom it sees fit to contract," there is no evidence that PTI ever turned away anyone in the music industry who applied to it for air transportation and was willing to pay its fee.

Woolsey became aware in the late 1980s of the fact that most country musicians travel by bus, and he determined to take advantage of that largely untapped market. In 1989, Woolsey sent Reba McEntire's manager (who is also her husband) information about the services offered by PTI. Although PTI engaged in self-promotion in a major periodical read by many in the music industry, Woolsey considered it important to make direct contact with stars like McEntire in order to expand from "rock" into the country music segment of the music industry.

Shortly after the "press kit" sent by PTI to McEntire's manager arrived, an agreement was negotiated by Reba's Business, Inc. ("Reba's Business") and PTI, whereby PTI agreed to transport McEntire and her entourage for a fee for a minimum number of hours of flight time per year.[2] An additional standard hourly fee was to be levied for any flight time over and above the minimum hours specified in the contract. PTI agreed to provide a specific aircraft for the exclusive use of McEntire and her guests. PTI painted Reba McEntire's name and that of her son, Shelby Blackstock, on the

---

[1] In a "thank you note" to twenty-five of its clients in the music industry which was published in an issue of the weekly magazine *Performance International,* PTI proclaimed, "Prestige Touring, Inc., is the # 1 air support company [for the music industry] in the United States." The twenty-five artists listed in the "thank you note" were: Reba McEntire, Billy Joel, Ricky Skaggs, Larry Gatlin & the Gatlin Brothers, the Jerry Garcia Band, Duran Duran, Chicago, Kiss, Alice Cooper, Clint Black, Europe, Arron Tippon, Cinderella, Robert Plant, Whitesnake, Jimmy Buffett, U2, Depeche Mode, Stevie Nicks, the Judds, Don Williams, Sawyer Brown, Chet Atkins, the Grateful Dead, and Garrison Keillor.

[2] The fee was structured so as to comply with the requirements of FAR Part 91. However, Woolsey admitted that the fee he charged McEntire in this case was lower than that he charged some of the rock musicians with whom he had contracts (understood to be governed by FAR Part 135), because he hoped to promote PTI's entry into the "country and western" market.

fuselage of the airplane. McEntire and her guests were permitted to leave their personal belongings on the plane at all times. PTI agreed to McEntire's request that flights be made from the airport in Gallatin, Tennessee, which was more conveniently located for McEntire than the Nashville airport at which PTI originally intended to provide her with service.[3] PTI rented an apartment in the Gallatin, Tennessee area, in order that a flight crew would be available to transport Ms. McEntire on short notice.

Woolsey claims that all of the "lease agreements" between PTI and Reba's Business were intentionally designed so as to comport with the requirements of FAR Part 91, not FAR Part 135. He contends that these leases constituted "time sharing agreements," which are governed under FAR Part 91 if they involve private or contract carriers. Thus, whether or not the leases comport with the requirements of FAR Part 91, the crucial question remains whether PTI acted as a common carrier with respect to the flights in question.

When another PTI airplane for which Reba's Business had contracted crashed,[4] Reba's Business ceased doing business with PTI. On July 5, 1991, a Federal Aviation Administration ("FAA") Administrator issued an emergency order revoking Woolsey's commercial pilot certificate due to his alleged violation of Section 91.13(a) of the Federal Aviation Regulations, 14 C.F.R. § 91.13(a).[5] Woolsey was alleged to have served as pilot in command on fifty-three flights for compensation without meeting the training and examination requirements of FAR Part 135. He was also alleged to have intentionally stopped an engine during one flight in order to avoid having to stop

---

[3]The change of airports entailed a reduction in the level of safety available, because the Gallatin airport's runway was shorter. It is unclear from the record whether the significance of that safety reduction was explained to McEntire or her manager when they negotiated the change of airports. It appears that operations under FAR Part 135 are not permitted to be conducted at the Gallatin Airport. We note, however, that the change of airports does not appear to have factored into the FAA's decision to revoke Mr. Woolsey's certification.

[4]Ms. McEntire was not aboard the flight, but some of her employees were.

[5]FAR § 91.13(a) provides that "No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."

for fuel.[6]

On July 24, 1991, after an evidentiary hearing, an administrative law judge orally affirmed the FAA Administrator's decision. Petitioner appealed to the National Transportation Safety Board, which on Aug. 28, 1991, issued an opinion affirming the administrative law judge's decision with respect to the revocation of Woolsey's license. The NTSB refused to affirm the administrative law judge's finding that the intentional engine stoppage constituted careless or reckless endangerment of the life or property of others,[7] nevertheless concluded that "the sanction of revocation is clearly appropriate where, as here, respondent operated as pilot in command of fifty-three flights with paying passengers, to whom he owed a high standard of care, and when he did not have the necessary training, examinations and check rides required of him under Part 135 [which applies to common carriers]." The NTSB based its finding that PTI was a common carrier on the definition of that term provided in FAA Advisory Circular No. 120-12A.

Woolsey appealed the NTSB decision to this court pursuant to 49 U.S.C.App. § 1486(a).[8] PTI is not a party in the instant case. First, we must decide whether the NTSB erred in affirming the administrative law judge's admission of certain evidence which was offered to support the Federal Aviation Administration's argument that PTI held itself out to the public as a common carrier. Second, in considering whether the comparatively stringent safety regulations of Part 135 apply (as opposed to those of Part 91), we must decide whether the flights in question were operated by

---

[6]For the reasons explained *infra,* the issue of the engine stoppage on one of the flights is not presented in this appeal.

[7]This part of the NTSB's decision is not being appealed by the FAA.

[8]49 U.S.C.App. § 1486(a) provides:

> "Any order, affirmative or negative, issued by the Board or Secretary of Transportation under this chapter, except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 1461 of this Appendix, shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failing to file the petition theretofore."

Woolsey in "common carriage," a term that the Federal Aviation Regulations leave undefined.

## DISCUSSION

## I. THE ADMINISTRATIVE LAW JUDGE'S ADMISSION OF EVIDENCE OF PTI'S MARKETING EFFORTS

Woolsey claims that the NTSB erred in affirming the administrative law judge's admission into evidence of Exhibits A-9 through A-15, which were offered by the FAA to show that PTI had held itself out to the public.[9] Woolsey contends that these exhibits should not have been admitted because they were not authenticated by any witness with personal knowledge of them. He further contends that the failure to authenticate the documents by presenting their authors or signatories as witnesses deprived him of the right to confront and cross-examine witnesses against him.

The NTSB has not adopted rules of evidence. In 1986, the Administrative Conference of the United States adopted recommendations which stated that it would be improper to *require* agencies

---

[9]Exhibits A-9 through A-15 consist of the following:

A-9: An article in *Performance International* magazine, which is a periodical published weekly and available by subscription;

A-10: An advertisement in the form of a thank-you note from PTI to its clientele, published in *Performance International* magazine;

A-11: A facsimile transmission from the manager of the Judds, a country music duo, to FAA investigator Hall, and a cancelled check made out to Prestige Touring by the Judds' manager;

A-12: "Information packet" sent by PTI to the manager of the Judds, which claims that PTI has "strict flight requirements that meet the highest Federal Aviation regulations, states that PTI specializes in serving the music business, and lists as PTI's past or current clients at least twelve major rock and country music stars, as well as the radio personality Garrison Keillor and former presidents Carter and Ford;

A-13: "Press kit" containing excerpt from a promotional "article" about PTI contained in *Performance International* magazine; cover letter from PTI to the manager of the Judds, noting that PTI has three offices in the southern United States;

A-14: Facsimile transmission sent to FAA investigator Tucker by TKO Management on that company's letterhead, and a copy of a contract between PTI and the musical group Sawyer Brown;

A-15: A letter and a check made out to PTI from Cherry Air, both of which were sent to FAA inspector Tucker by Cherry Air's president, Jim Donaldson, at Tucker's request.

to apply the Federal Rules of Evidence.  Recommendation 86-2, 1 C.F.R. § 305.86-2.  The only Federal Rule of Evidence strongly recommended by the Conference for use in agency proceedings was Fed.R.Evid. 403 ("Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time").  Section 556(d) of the Administrative Procedure Act, which applies to proceedings before the NTSB, only requires the exclusion of oral or documentary evidence which is irrelevant, immaterial, or unduly repetitious.  5 U.S.C. § 556(d).  *Sorenson v. National Transportation Safety Board,* 684 F.2d 683, 686 (10th Cir.1982).  This standard is "somewhat lower" than that required for authentication of documents under Fed.R.Evid. 901, but nevertheless "does not completely obviate the necessity of proving by competent evidence that real evidence is what it purports to be.... [a]bsent *any* such proof, the evidence to be admitted would be irrelevant or immaterial and hence should be excluded from the proceeding."  *Gallagher v. National Transportation Safety Board,* 953 F.2d 1214, 1218 (10th Cir.1992) (emphasis added) (toxicological report held admissible in NTSB proceeding despite fact that chain of custody relating to body fluid sample "was somewhat compromised";  NTSB was not required to infer any deliberate acts of tampering or gross negligence in handling the evidence when none had been shown).

Although we note that a slightly lower standard for admission of documentary evidence applies in administrative proceedings than in the federal courts, we find that admission of the documents in question would have been proper under the Federal Rules.  Woolsey contends that an FAA official's testimony that he had requested and received the documents during the course of his investigation was insufficient under Fed.R.Evid. 901(b)(1) to assure that the documents are authentic.  He also claims that since neither the publishers nor the authors of the telephone books, periodicals, cancelled checks, letters, lease agreements and press kits testified, he was deprived of the right as "an accused" to confront and cross-examine witnesses against him.  The FAA counters that there was no danger that the documents were not what they were claimed to be, and that Mr. Woolsey had every opportunity to cross-examine the FAA investigators who testified as to the method by which the documents were obtained and stored prior to the hearing.  Mr. Woolsey did not claim that any of the documents allegedly signed by his employees contained forged signatures.

Exhibits A-9 and A-10, which consist of articles and self-promotional statements made by PTI in the weekly magazine *Performance International,* are self-authenticating documents under Fed.R.Evid. 902. While Woolsey appears to admit for the first time in his Reply Brief that the documents are self-authenticating, he attempts to maintain the claim that they should not have been admitted by arguing that they were irrelevant. Specifically, Woolsey claims that the self-promotional articles in Exhibits A-9 and A-10 pertained to service provided by PTI on a turboprop airplane, operation of which is governed by FAR Part 125, and not by FAR Part 91 or 135. We find this argument unpersuasive, because the exhibits do not specifically refer to any particular type of aircraft.

We find that there was no error in the admission of Exhibits A-11 through A-15. We believe there was adequate assurance of authenticity for documents A-11 through A-15 to be admitted. All of these documents pertain to solicitation of business by PTI.[10] The documents were requested by, and sent to, FAA investigators, who were available to testify about the method in which the documents were obtained and kept by the FAA, and why it was reasonable to consider them authentic.[11] There is no evidence that the signatures on the documents were forged or that the documents were otherwise falsified; nor is there any evidence that the documents, once received by the FAA investigators, ever left the investigators' hands. Fed.R.Evid. 901(a) provides that, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The Advisory Notes following Fed.R.Evid. 901 state that testimony of witnesses having "personal knowledge," broadly construed, can support the authenticity of a document.[12] We do not believe that

---

[10]See *infra,* note 9.

[11]Even if this involved hearsay, "the only limit to the admissibility of hearsay [in the administrative context] is that it bear satisfactory indicia of reliability.... [I]t is not the hearsay nature *per se* of the proffered evidence that is significant, it is its probative value, reliability and the fairness of its use that are determinative." *Calhoun v. Bailar,* 626 F.2d 145, 148 (9th Cir.1980), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981). See also *Richardson v. Perales,* 402 U.S. 389, 407-08, 91 S.Ct. 1420, 1430-31, 28 L.Ed.2d 842 (1971).

[12]A "witness with knowledge" of a matter can be anyone from "a witness who was present at the signing of a document to [one who can testify that] narcotics [were] taken from an accused and account[ ] for custody through the period until the trial." Advisory Note Example (1). *See also Administrator v. Moore,* 2 N.T.S.B. 3216 (1981); *Administrator v. Harrison,* 2 N.T.S.B.

the admission of Exhibits A-11 through A-15 deprived Mr. Woolsey of "the accused's right to confront and cross-examine witnesses." All but one of the cases Mr. Woolsey cites in advancing his argument are criminal cases involving the Sixth Amendment. We consider those cases inapposite in this civil proceeding. *See Administrator v. Harrison,* 2 N.T.S.B. 504 (1973). The single civil case cited by Mr. Woolsey is *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). That case involved an administrative proceeding in which a private individual working for a private company had his security clearance revoked by the Defense Department of the United States. The Supreme Court found that the failure to provide the employee any opportunity to confront the evidence against him or to cross-examine witnesses violated due process. In *Greene,* the government presented no witnesses and "[i]t was obvious ... from the questions posed to petitioner and to his witnesses, that the [Industrial Employment Review Board] relied on confidential reports which were never made available to petitioner." 360 U.S. at 479, 79 S.Ct. at 1405. The petitioner in that case had no opportunity whatsoever to confront the evidence against him. In the instant case, by contrast, the FAA presented witnesses and documents which Woolsey was free to confront. Although he objected to the admission of the documents based on the absence of the persons who signed them, he did not claim the documents were forged or altered in any way. FAA investigators were available for cross-examination as to how they obtained the documents and why it would be reasonable to conclude that the documents were authentic.

Even if admission of any of the documents in Exhibits A-11 through A-15 was error, it was harmless. There was additional evidence on which the administrative law judge and the NTSB could have based the decision to affirm the FAA's revocation of Mr. Woolsey's commercial pilot certification. There was evidence presented that PTI actively solicited McEntire's business by sending her letters and brochures; engaged in self-promotion in periodicals available to the general public;[13] publicly listed the names of scores of its clients in the music industry;[14] and advertised in the yellow

---

504, 505 (1973).

[13]Exhibits A-9 and A-10.

[14]Exhibits A-9 and A-10.

pages of the telephone book.[15]  We consider this to be "substantial evidence" supporting the view that PTI held itself out to the public as a common carrier.[16]

## II. DEFINITION OF "COMMON CARRIAGE" WITH RESPECT TO AIR CARRIERS; APPLICATION OF PART 135 IN THE INSTANT CASE

Woolsey contends that the contracts or "leases" for air transportation signed by himself and country music singer Reba McEntire were designed with an eye to compliance with the requirements of FAR Part 91.[17]  The Federal Aviation Administration ("FAA"), however, contends that the more stringent safety requirements of FAR Part 135[18] apply.  The FAA admits that the flights in question in this case would be governed by Part 91 had PTI not advertised its services and actively solicited business.  The FAA contends, however, that PTI held itself out to a definable segment of the general public as being available for air carriage for compensation, and that PTI was for that reason a "common carrier."  FAR Part 91 specifically excludes common carriers from its coverage, leaving them subject to the more stringent safety standards of FAR Part 135.  The policy behind this distinction appears to be that the general public has a right to expect that airlines which solicit their business operate under the most searching tests of safety.  The term "common carrier" is not defined in the Federal Aviation Act or the Federal Aviation Regulations.  Hence, we must look to other sources (the most important of which is the common law relating to air carriers) in order to determine whether PTI was a common carrier with respect to the flights in question in this case.

In response to potential confusion as to the meaning of the term "common carrier" under the

---

[15]The listing for PTI appeared under the heading "Aircraft Charter, Rental & Leasing Service."

[16]As long as the findings of fact of the Board are supported by substantial evidence, they must be affirmed.  49 U.S.C.App. § 1486(e).  *See King v. Nat'l Transp. Safety Bd.,* 766 F.2d 200, 203 (5th Cir.1985) ("As an appellate court reviewing an administrative order, it is not [this Court's] function to reevaluate the weight of the evidence or to reexamine the credibility choices made by the finder of fact") (*quoting Stern v. Butterfield,* 529 F.2d 407, 409 (5th Cir.1976));  *Nadiak v. Civil Aeronautics Bd.,* 305 F.2d 588, 592 (5th Cir.1962), *cert. denied,* 372 U.S. 913, 83 S.Ct. 729, 9 L.Ed.2d 722 (1963) ("The function of a reviewing Court is to accept the findings of fact made by the administrative body if there is substantial evidence in the record as a whole to support those findings").

[17]14 C.F.R. § 91.

[18]14 C.F.R. § 135.

Federal Aviation Act, the Federal Aviation Administration issued Advisory Circular No. 120-12A ("Advisory Circular") on April 24, 1986. The Advisory Circular provides FAA employees and members of the aviation industry with "general guidelines for determining whether current or proposed transportation operations by air constitute private or common carriage." Advisory Circular at 1. The Advisory Circular defines a common carrier as one which holds itself out to the public as being willing to transport persons or property for compensation, to the extent that its facilities permit.

Mr. Woolsey was aware of the definition of "common carriage" provided by the FAA in its Advisory Circular. However, Mr. Woolsey contends that PTI not only did not hold itself out to the public, but that the definition of common carriage contained in the Advisory Circular is too broad, does not have the force of law because it was not promulgated as a regulation under the Administrative Procedure Act, and is inconsistent with the common law definition of a common carrier. Woolsey claims that the common law defines a common carrier as one which (1) holds itself out to the public as willing to carry anyone who applies so long as there is room in the aircraft, (2) at a uniform price applicable to all who apply. He claims that PTI "furnished air transportation only to those with whom it saw fit to contract, as a private or contract carrier, and ... any ... "holding out" was no more than an invitation to negotiate such contracts on a case-by-case basis, without any evidence of uniformity of charges or willingness to carry all persons applying so long as there is room in the aircraft."

Instead of focussing on whether PTI held itself out to the public, Mr. Woolsey discusses at length the nature of PTI's contracts with Reba's Business; the fact that Ms. McEntire was given exclusive use of a PTI airplane; and the fact that the contract was not for a single or even several flights, but for a year's term. In so doing, he hopes to establish that the agreement at issue here was not a charter agreement, but a "time sharing" agreement under FAR Part 91;[19] that the airplane known by air traffic controllers across the nation as "Reba Jet" was more like a private airplane than

---

[19]The term "time sharing agreement" is defined in Section 91.501(c) as "an arrangement whereby a person leases his airplane with flight crew to another person, and no charge is made for the flights conducted under that arrangement other than those specified in paragraph (d) of this section."

an airplane owned by a common carrier and chartered by a private party.

Woolsey notes that many of the cases defining "common carriage" as the FAA does are cases relating to economic regulation of air carriers, as opposed to safety regulation of air carriers. He contends that any relevance these cases might have had in the area of aviation safety was decimated in 1978 by Congress' abolition of the Civil Aeronautics Board and repeal of economic regulations affecting air carriers. Airline Deregulation Act of 1978, Pub.L. No. 95-504, Section 3; 92 Stat. 1705. We do not agree that these cases "have no precedential value after 1978," nor do we agree that the term "common carrier" as defined in economic regulation cases has no relevance in cases concerning safety regulation. The same definition has been applied in both economic and safety regulation cases. The term "common carrier," as used in the common law, was not affected by the repeal of certain economic regulations under the Airline Deregulation Act of 1978. The mere fact that one of the bodies responsible for developing the common law definition of common carriage no longer exists is no argument for abolishing the common law definition developed while that body was in existence.[20]

We do not address the legal sufficiency of the Advisory Circular, for we find that the definition of common carrier provided therein is in relevant respect the same as that found at common law. Contrary to the assertion of Mr. Woolsey, the FAA does not seek to broaden the definition of common carriage. Mr. Woolsey seeks to narrow that definition in a manner inconsistent with the case law. He would have us hold that an air carrier engages in common carriage only when it transports all members of the public at the same price whenever it has room on its airplanes. Although there is some support for the view that a common carrier must deal on the same terms and conditions with all of its customers, *see, e.g., Semon v. Royal Indemnity Co.,* 279 F.2d 737 (5th Cir.1960) (charter of a fishing boat found to constitute private or contract carriage where there was no evidence of

---

[20]Had Congress defined "common carriage" so as to replace the common law definition developed by the Civil Aeronautics Board and the courts, the question before us would be different.

holding out), we are aware of no cases actually applying such a restrictive test to air carriers.[21]

The Advisory Circular correctly points out that the crucial determination in assessing the status of a carrier is whether the carrier has held itself out to the public or to a definable *segment* of the public as being willing to transport for hire, indiscriminately. *Las Vegas Hacienda, Inc. v. Civil Aeronautics Bd.,* 298 F.2d 430 (9th Cir.), *cert. denied,* 369 U.S. 885, 82 S.Ct. 1158, 8 L.Ed.2d 286 (1962); *East Coast Flying Serv. Enforcement Proceeding,* 46 C.A.B. 640 (1967); *M & R Inv. Co., Inc. v. Civil Aeronautics Bd.,* 308 F.2d 49 (9th Cir.1962); *Arrow Aviation, Inc. v. Moore,* 266 F.2d 488 (8th Cir.1959); *Southeastern Aviation, Inc. Enforcement Proceeding,* 32 C.A.B. 1281 (1961); *Consolidated Flower Shipments, Inc.,* 16 C.A.B. 804 (1953), *aff'd, Consolidated Flower Shipments v. Civil Aeronautics Bd.,* 213 F.2d 814 (9th Cir.1954); *Intercontinental Enforcement Proceeding,* 41 C.A.B. 583 (1965). The test "is an objective one, relying upon what the carrier actually does rather than upon the label which the carrier attaches to its activity or the purpose which motivates it." *Las Vegas Hacienda,* 298 F.2d at 434.

The cases which Woolsey cites in support of his definition of "common carriage" are distinguishable. Most of these cases involve definitions of common carriage developed outside the context of aviation law. *See, e.g., Terminal Taxicab v. Dist. of Columbia,* 241 U.S. 252, 36 S.Ct. 583, 60 L.Ed. 984 (1916) (taxicabs); *Semon,* 279 F.2d 737 (fishing boat); *Home Ins. Co. v. Riddell,* 252 F.2d 1 (5th Cir.1958) (trucks). We agree with the Ninth Circuit that these cases are inapposite:

> It would be wholly unjustified simply to assume that the [disputed] terms are to have the precise meaning attached to them in the definitions of the Motor Carrier Act and in the case

---

[21]In *Jackson v. Stancil,* 253 N.C. 291, 116 S.E.2d 817, 824-25 (1960), the North Carolina Supreme Court quoted two early commentators on aviation law for the proposition that "[t]he chief test applied to determine whether a carrier is a "common carrier" is whether or not the operator of the aircraft either by express written or oral statements, or by his course of conduct, holds himself out to the public as willing to carry at a fixed rate all persons applying for air transportation ... so long as his plane or planes will carry them." However, that court went on to apply a more multivariate test for common carriage, in which the dispositive factor was not whether the carrier charged uniform rates or agreed to carry all passengers for whom its aircraft had room, but whether the carrier *held itself out to the public as being available for service.* The court specifically noted that a charter carrier "may limit its operations solely to charter flights and still be a common carrier." *Id.* 116 S.E.2d at 824. Thus, the court implicitly credited the idea that a charter carrier can qualify as a common carrier even if it does not offer to every member of the public every available seat on its aircraft, but offers various package deals to members of a defined segment of the public.

law under that statute.... We have been warned of the impropriety of assuming that Congress intended that judicial precedents and rules of interpretation applicable to the regulation of other forms of transportation were to be applied to the regulation of transportation by air: "However useful parallels with older forms of transit may be in adjudicating private rights, we see no reason why the efforts of the Congress to foster and regulate development of a revolutionary commerce that operates in three dimensions should be judicially circumscribed with analogies taken over from two-dimensional transit."

*Las Vegas Hacienda,* 298 F.2d at 437, 439 n. 31 (*quoting Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 108, 68 S.Ct. 431, 434-35, 92 L.Ed. 568 (1948)).

The few cases cited by Woolsey which do concern aviation law are either distinguishable or only weakly support his argument in dicta. *See, e.g., Jackson v. Stancil,* 253 N.C. 291, 116 S.E.2d 817 (1960) (where appellant did not list his business in the telephone book or advertise in any other fashion, and was affirmatively sought out by a former flying student for a single incident of transportation, appellant engaged in private or contract carriage; quoting with approval two early commentators who advanced test for common carriage involving holding out, uniform tariffs, and willingness to serve all persons aircraft can accommodate, but applying more multifaceted test for common carriage in which holding out was dispositive factor); *Seven Seas Airlines, Inc., Enforcement Proceeding,* 34 C.A.B. 45 (June 26, 1961) (noting in *dicta* that "if a carrier is not required to dedicate or assign to the exclusive use of certain patrons any particular equipment or if there is nothing to prevent a carrier from hauling with any such equipment, it has been held that the carriage is common"; but not stating that dedication of an airplane to the exclusive use of a single party *necessarily* would constitute private or contract carriage); *Scarborough v. Aeroservice, Inc.,* 155 Neb. 749, 53 N.W.2d 902 (1952) (owner of a school for airplane mechanics, who agreed to transport one of his students on a single 45-minute flight, was private carrier).

There was substantial evidence, even excluding Exhibits A-11 through A-15, on which the administrative law judge and the NTSB could conclude that PTI had held itself out as being willing to serve all members of the music industry who were able to pay for its services.[22] Although Woolsey claims that PTI was "discriminating" about whom it would serve, there is no evidence that PTI ever

---

[22]As long as the findings of fact of the Board are supported by substantial evidence, they must be affirmed. 49 U.S.C.App. § 1486(e). *See King,* 766 F.2d at 203; *Nadiak,* 588 F.2d at 592-93.

turned away any member of the music industry who was able to pay PTI's fees. On these facts alone, the NTSB was justified in concluding that PTI acted as a common carrier.

Woolsey claims that because PTI does not utilize uniform tariffs, it is not a common carrier.[23] While most common carriers do utilize uniform tariffs applicable to all who apply for service, we agree with the FAA that the "absence of tariffs or rate schedules, transportation only pursuant to separately negotiated contracts, or occasional refusals to transport, are not conclusive proof that the carrier is not a common carrier." Advisory Circular at 1. *See East Coast Flying Serv.,* 46 C.A.B. at 644; *Southeastern Aviation,* 32 C.A.B. at 1284-85. The existence of a contract negotiated for a special price does not alone suffice to make the carrier a private carrier. *See, e.g., Las Vegas Hacienda,* 298 F.2d at 434; *Intercontinental,* 41 C.A.B. at 601-02; *Southeastern Aviation,* 32 C.A.B. at 1285.

What is crucial is that the common carrier defines itself through its own marketing efforts as being willing to carry any member of that segment of the public which it serves.[24] In this case there was sufficient evidence on which the NTSB could conclude that Prestige Touring had marketed itself to numerous rock stars, and sought to enter and capture the country music industry by directly soliciting the business of country music luminaries like McEntire.

Woolsey claims he structured the contract between PTI and Reba's Business, Inc., in order to make it comport with the requirements of FAR Part 91.501 (subpart F), 14 C.F.R. § 91.501, which does not apply in conjunction with Part 135. The exception to Part 135 on which Woolsey relies is found at FAR Part 91.501(b)(6), which states that "Operations that may be conducted under the rules

---

[23]For this proposition, Woolsey relies on *Jackson v. Stancil,* 253 N.C. 291, 116 S.E.2d 817, 824-25 (1960), in which the North Carolina Supreme Court quoted with approval two early commentators on aviation law for the proposition that common carriage involves uniform pricing. However, as noted *supra,* the North Carolina Supreme Court actually applied a multifaceted test in which no single factor besides "holding out" was dispositive.

[24]It may be objected that if the relevant "segment" of the public is defined narrowly enough, *any* carrier transporting more than one party might conceivably be found to be a common carrier. The slope is not that slippery. Only those carriers who affirmatively hold themselves out to the public, either by advertising or by a course of conduct evincing a willingness to serve members of the general public (or a segment thereof) indiscriminately, so long as they are willing to pay the fee of the carrier, will qualify as common carriers.

in this subpart instead of those in parts 121, 129, 135, and 137 of this chapter *when common carriage is not involved,* include—... The carriage of company officials, employees, and guests of the company on an airplane operated under a time sharing ... agreement ..." (emphasis added). The term "time sharing agreement" is defined in FAR Part 91.501(c)(1) as "an arrangement whereby a person leases his airplane with flight crew to another person, and no charge is made for the flights conducted under that arrangement other than those specified in paragraph (d) of this section."[25] Woolsey claims that PTI charged no more than permitted by the regulation. The FAA appears to concede in its brief that "[Subpart F] provides for certain limited exceptions to the requirement that passenger-carrying operations conducted in air commerce for compensation or hire (in the type aircraft Woolsey was using) be conducted under Part 135, the operating rules applicable to air taxi and commercial operators. If Woolsey's operations in fact met the requirements set forth in FAR § 91.501, it appears that he could have conducted those operations under the rules of that subpart, rather than under the more stringent requirements of FAR Part 135." Respondents' concession is more apparent than real, however, for the exceptions to application of Part 135 to operations like those which took place in the instant case would apply only with respect to private or contract carriers.

Because we have affirmed the finding of the NTSB that the aircraft used for the flights in question were operated by Woolsey in common carriage, we find that Mr. Woolsey's claim that he intended to bring these operations under Part 91 is unavailing. The objective conduct of PTI, holding out its services to the music industry and actually serving scores of different musicians, makes PTI's operations subject to FAR Part 135. The subjective intentions of Woolsey are not controlling. It is the objective conduct of himself and his corporation which bring their actions under FAR Part 135.

---

[25]The charges permitted to be made for transportation under a time sharing agreement are as follows:

> (1) fuel, oil, lubricants and other additives; (2) travel expenses of the crew, including food, lodging, and ground transportation, (3) hangar and tie-down costs away from the aircraft's base of operation; (4) insurance obtained for the specific flight; (5) landing fees, airport taxes, and similar assessments; (6) customs, foreign permit, and similar fees directly related to the flight; (7) in-flight food and beverages; (8) passenger ground transportation; (9) flight planning and weather contract services; (10) an additional charge equal to 100% of the expenses for fuel, oil, lubricants and other additives. 14 C.F.R. § 91.501(d).

*Las Vegas Hacienda,* 298 F.2d at 434. *See also Consolidated Flower Shipments,* 16 C.A.B. at 805 ("[A] carrier cannot divest itself of its common-carrier status by the simple expedient of entering into an agreement with its customers purporting to relieve itself of its normal liability"). The Federal Aviation Regulations are primarily designed to protect the public safety, and not the private contractual aspirations of given parties.

CONCLUSION

We have arrived at our destination: AFFIRMED.


DeMOSS, Circuit Judge, dissenting:

In my opinion, the "flight" in this case has been long and bumpy, our instruments did not work well, and I think we have landed at the wrong airport. I write this dissent to explain why.

I. *Who is a "common carrier" and when is "common carriage not involved?"*

The fundamental problem in this case is one of definitions. Neither Congress nor the Federal Aviation Administration ("FAA") have defined the term "common carriage" or "common carrier". I am amazed that this is the case. First, I feel strongly that there is a serious due process problem in a quasi-judicial proceeding, such as is involved in this case, if the revocation of a commercial pilot's license turns on the meaning of a critical term which the administrative agency has not previously defined under its rule making powers. Clearly the FAA in issuing its advisory circular that purports to define "common carriage", did not comply with the procedure for the adoption of a formal rule or regulation. And, taking away a commercial pilot's license has an economic impact on that individual very similar to a fine or jail term or taking away a lawyer's license to practice. An individual should not be deprived of their livelihood as a result of an administrative agency's ad hoc definition of a critical term.

Second, I think the meaning that the agency gives to the term "common carriage" in this case is fundamentally inconsistent with other terms that are defined by the statute and by the published regulations.

As I read the definitions set forth in the statute (49 U.S.C.App. § 1301) and in the regulations

(14 C.F.R. § 1.1), the terms are defined as follows:

A. "Air carrier" is one who engages in "air transportation."

B. "Air transportation" means "interstate air transportation," "overseas air transportation," or "foreign air transportation," or the "transportation of mail by aircraft".

Each of interstate, overseas, and foreign air transportation are defined to be "the carriage by aircraft of persons or property <u>as a common carrier</u> for compensation or hire" (underlining added) plus the individual geographical definition.

C. "Air commerce" means:

1. "Interstate air commerce";

2. "Overseas air commerce";

3. "Foreign air commerce";  or

4. "Operation or navigation of an aircraft within a federal airway or directly affecting or endangering safety in interstate, overseas, or foreign air commerce."

D. Each of "interstate air commerce", "overseas air commerce", and "foreign air commerce" are defined as "the carriage by aircraft of persons or property for compensation or hire", plus the geographical definition pertinent to each one.

E. The regulations (but not the statute) contain the definition of "commercial operator" as "a person who for compensation or hire engages in carriage by aircraft in <u>air commerce</u> of persons or property, <u>other than as an air carrier or foreign air carrier or under Part 375</u> " (underlining added.)

Under this definitional structure, it is open, obvious, and clear to me that the fundamental distinction between "air carrier" and "air transportation" on the one hand, and "commercial operator" and "air commerce" on the other hand, is that the first two involve carriage "*as a common carrier.*"

Now to this set of definitions, the National Transportation Safety Board ("NTSB") on page 6 of its opinion in this case would add the definition of "common carriage" as

"... the four elements of common carriage are:

(1) a holding out of a willingness to

(2) transport persons or property

(3) from place to place

(4) for compensation."

However, the NTSB's definition wipes out the statutorily created distinction between air transportation and air commerce;  and it runs contrary to it's own definition of "commercial operator"

which expressly points out that a commercial operator is one who acts "other than as an air carrier". Elements (2), (3), and (4) of the NTSB definition set out above, are the same elements referred to in the definition of both "air transportation" and "air commerce"; and the new definition creates a seemingly unanswerable conundrum for a commercial operator:

> How can I engage in my business of carrying persons or property for compensation or hire as a commercial operator in air commerce, if by simply holding myself out to prospective customers I become engaged in "common carriage" which makes me an air carrier subject to regulation under entirely different sets of regulations?

Surely there is some Constitutional right to free speech for business which would encompass making known to prospective customers the availability of your services. Bottom-line, therefore, a stamp of approval to the NTSB's definition which might be inherent in an affirmance of this case may have implications way beyond the bounds of Woolsey's license revocation dispute which is directly involved.

II. *How does § 91.501 interrelate with § 135.1 of the applicable regulations?*

Much of the argument and discussion in this case relates to this question which is a riddle wrapped in another conundrum. Assuming that the airplanes piloted by Woolsey meet the test of being "turbojet powered, multiengined, civil airplanes" as defined in paragraph (a) of § 91.501, the first sentence of subparagraph (a) makes clear that the operation of these airplanes is covered by the rules in "this subpart, [§§ 91.501-91.533] ... in addition to those prescribed in *other subparts of this part* ", [i.e. Part 91]. Consequently, § 91.5 in subpart A of Part 91 is clearly applicable to these planes and requires compliance by the "pilot in command" with the "requirements of § 61.58 of this chapter." Section 61.58 establishes rules for periodic proficiency checks or flight checks which are similar to, but perhaps not identical with, provisions for periodic flight testing in Part 135. The Board, however, accuses Woolsey of failing to comply with the Part 135 provisions. Consequently, even if Woolsey were correct in his argument that the "time sharing agreement" in this case relieved him of the necessity of complying with the periodic performance checks in Part 135 as charged by the NTSB, he would still have to comply with § 91.5 and § 61.58. The record fails to show whether Woolsey did in fact comply with § 61.58 and whether the NTSB's complaint is really only as to the timing of getting those rechecks under the more frequent requirements of Part 135. If that were in

fact the case, then the sanction of license revocation levied upon Woolsey is grossly out of proportion to the nature of the "wrong" that he committed. A suspension of his license for a fixed period of time or a money fine would have been the appropriate penalty if he did in fact get retested on the § 61.58 schedule rather than the Part 135 schedule. On the other hand, if Woolsey was not retested at all for periods of time longer than those required under § 61.58, then his contention that the time sharing agreement eliminates the applicability of Part 135, even if correct, would still leave him in noncompliance with §§ 91.5 and 61.58.

III. *Must the government prove that the airplanes and flights in questions were governed by Part 135 or is it sufficient that the government simply prove that Prestige Touring was not entitled to the benefits of 91.501?*

On page 6 of its opinion, the Board stated:

The law judge found that, notwithstanding respondent's claims that he strived to conform to the requirements of Section 91.501, the overwhelming evidence established that these operations were governed by Part 135 because Prestige Touring, Inc. failed to meet the threshold requirement of not being "common carriage". We agree.

From the same opinion on page 2, it appears that Woolsey was charged with careless or reckless operation of an aircraft in violation of § 91.13(a)

... by serving as pilot in command on 53 flights for compensation or hire, without meeting the training and examination requirements of §§ 135.293(a) and (b), 135.297(a), 135.299(a), and 135.343.

Clearly, these are not "criminal" proceedings. They are quasi-judicial in nature and result in the imposition of sanctions based on past actions. The Board therefore should have to prove that the flights in question were covered by Part 135. From this perspective, the finding of the law judge on page 6 of the opinion quoted above is just flat wrong. The mere fact that Prestige Touring may have failed to meet the "threshold requirement of not being common carriage" [which is part of § 91.501] certainly does not establish that Part 135 is applicable to the flights in question. As set forth § 135.1(a), the rules in Part 135 govern:

(1) Air taxi operations conducted under the exemption authority of Part 298 of this Title;

(2) The transportation of mail by aircraft conducted under a postal service contract awarded under § 5402(c) of Title 39, U.S.C.;

(3) The carriage in air commerce of person or property for com pensation or hire as a commercial operator (not an air carrier) in aircraft having a maximum seating capacity of less

than 20 passengers or a maximum payload capacity of less than 6,000 lbs., or the carriage in air commerce of persons or property in common carriage operations solely between points entirely within any state of the United States, the aircraft having a maximum seating capacity of 30 seats or less and a maximum payload capacity of 7,500 lbs. or less.

In my view, none of these subparagraphs apply to the airplanes and flights which Woolsey served on as pilot in command. The first subparagraph relates to "air taxi operators"; and § 298.3(b) clearly states:

... a person who does not observe the conditions set forth in paragraph (a) of this section shall not be an air taxi operator within the meaning of this part with respect to any operations conducted while such conditions are not being observed.

One of the conditions in paragraph (a) was registration with the Board in accordance with subpart (c). Nothing in the record makes reference to the registration by Prestige Touring with the Board under subpart (c) of Part 298.

Similarly, subparagraph (2) of § 135.1(a) regarding transportation of mail is not applicable because there was clearly nothing referencing the carriage of mail on any of the flights which Woolsey commanded.

There are two distinct and separate sentences to subparagraph (3) joined by the disjunctive "or". The second of these sentences relating to the carriage of persons in common carriage operations solely between points *entirely within any state* (emphasis added) of the United States might possibly be applicable to some of the flights which Woolsey commanded, but that is not developed in the record. That leaves the first sentence of subparagraph (3) as the only portion of § 135.1(a) that might apply; and here we meet again the definitional conundrum involved in this case. Assuming that the seating and payload capacities of the airplanes which Woolsey flew meet the limitations of the first sentence of subparagraph (3), the conundrum arises from the words "as a commercial operator (not an air carrier)" in this first sentence; and the definition which the Board uses to show that § 91.501 did not apply comes back to shoot the Board in the foot. The Board cannot have its cake and eat it too, and if the "holding out" by way of advertising and Yellow Pages listings caused Prestige's operations to be "common carriage" for purposes of 91.501, then Prestige cannot also be "a commercial operator (not an air carrier)" for purposes of subparagraph (3) of § 135.1(a).

In conclusion, I have to say that my gut reaction to this case is that the FAA decided to make a scape goat out of Woolsey because of the crash of the other aircraft carrying Reba McEntire's band. For the reasons set forth herein, I am unable to concur with my distinguished colleagues. I would reverse and remand for rehearing.