Laura URBAN, Plaintiff,

v.

FRONTIER AIR LINES, a corporation,
Defendant.

Civ. No. 3879.

United States District Court
D. Wyoming.
March 2, 1956.

Ellery, Gray & Hickey, Cheyenne,
Wyo., for plaintiff.

Clarence A. Swainson, Cheyenne,
Wyo., for defendant.

KERR, District Judge.

Plaintiff, Laura Urban, a fare-paying passenger on Frontier Airlines, brings this action for recovery of damages which she alleges she sustained through the negligence of defendant's employee.

The undisputed facts may be related, as follows: On the morning of December 31, 1954, plaintiff and her mother-in-law boarded flight No. 2 at Denver, Colorado, with destination Rawlins, Wyoming; prior to the arrival in Cheyenne the weather became rough and turbulent; the plane stopped in Cheyenne for seven or eight minutes and departed for Laramie, a distance of approximately 50 miles; upon leaving Cheyenne the weather continued to be turbulent—using the testimony of the stewardess "It was the roughest trip I have been on since I have been flying"; a short distance out of Cheyenne plaintiff requested permission to go to the plane's lavatory and was advised by the stewardess it was too rough and to "wait a little while"; plaintiff complied with this instruction and a few minutes later, according to plaintiff's testimony, the stewardess nodded her head and advised plaintiff that "I think you can go now"; the plaintiff unfastened her seat belt and went to the lavatory; while in the lavatory the plane hit a down draft, throwing plaintiff to the floor, from which fall she sustained a broken ankle. The testimony respecting permission to go to the lavatory is in striking conflict and constitutes the crux of this controversy.

Defendant in its third defense has interposed the defense of "assumption of risk" and alleges that plaintiff had knowledge that the plane was passing through rough and turbulent weather and that the plaintiff well knew the risk from unfastening her seat belt and leaving her seat. In the early and formidable stages of air travel this defense would be valid.

With each city in the United States linked by air line passenger service to every center of the world it can no longer be said that a passenger entering upon the modern commercial plane voluntarily assumes a risk with respect to the plane itself or its operation. Its pioneering and experimental days with the dangers incidental to trial and error have passed and like the steamships, railroads and automobiles this form of transportation is here to stay. Advertising by airlines of safe and fast travel can be found in most any periodical and newspaper.

The rules applicable to common carriers of passengers apply with equal force to aircraft. It should exercise the highest degree of care consistent with the practical operation of the plane and protection of its passengers from injury. 6 Am.Jur. Sec. 51. It follows that the defense of assumption of risk is without merit.

Upon arrival in Laramie a few minutes following the accident the stewardess made out the following report, in part as follows: "6. Did you witness accident? *Yes.* If so, describe what you saw, heard, or know about the accident: *Extreme turbulent weather. Patient attempted to get out of seat.* 7. Was injured person (or property owner) a passenger, employee or guest? *Passenger.* 8. Cause of accident (Explain in detail): *Pressure on foot due to turbulent weather & out of seat.* 9. Quote any statement by injured person (or property owner) as to cause: *Pressure on foot due to turbulent weather.*"

At Riverton, Wyoming, on the same date of the accident, the stewardess made a second report, the material portions being as follows: "Mrs. Laura Urban, 1060 Pennsylvania, Denver, Colo. Psgr. attempted to walk to blue room during turbulent weather. Seat belt sign was on & *I* was fastened in. Before I could get to psgr. we hit extreme turbulence & she was thrown up & then landed on her left foot very hard. I treated her for shock & could tell immediately it was broken. I elevated foot on blankets & pillows & notified Capt. I could not locate anything to use as splint however I did tie foot & ankle in triangular bandage as a sprain, so the foot would not move around during flt. & landing." As a witness for the defendant she testified:

"Q. What did you do? A. So I got out of my seat and as I got out I said to Mrs. Urban, 'It looks like it's going to be smoother', and I went up front and checked the child, and the child was in the seat belt.

"Q. Then what did you do? A. I turned around and when I came back Mrs. Urban was gone.

"Q. That's the first you noticed she was gone? A. Yes.

"Q. You were up front when she apparently left? A. Yes.

"Q. You never saw her? A. I never saw her leave her seat, no.

"Q. Did you see her unfasten her seat belt? A. No.

"Q. Did you tell her it was all right to go? A. No, I did not.

"Q. Did you at any time tell her she could go? A. No.

"Q. When did you do then when you came back and found Mrs. Urban wasn't in her seat? A. Well, it began to get turbulent again, and I knew it was going to get quite rough, so I turned to Mrs. Urban and I asked her where her partner was, and she said she had gone back there and 'you'd better see, because she was there quite some time'. So I went back, and she was there.

"Q. Was that the first that you knew she was out of her seat? A. Yes.

"Q. When you turned around and found she was gone? A. Yes.

"Q. Now, after you reached the 'blue room', what did you do? A. I opened the door and she was standing there with her foot off the floor, and I asked her if she was all right and she said yes, she was all right, but she couldn't stand on her foot.

"Q. What did you do? A. I immediately glanced at her foot and the bone was showing from her ankle, so I could tell it was broken.

"Q. What did you do? A. I helped her to her seat. She put her arm around my neck and we—

"Q. What was the condition of turbulence at that time? A. At that time it was still very rough. As a matter of fact we had a hard time getting her to her seat because it was still rough."

It will be observed that the reports filed by the stewardess and her testimony from the witness stand were in direct conflict. Viewing all of the testimony, facts and circumstances in the light most favorable to the defendant I am inclined to believe that the plaintiff was authorized and permitted by the stewardess to leave her seat and go to the lavatory as testified to by plaintiff; that such permission, after taking into consideration the existence of the rough and turbulent weather, constituted negligence on the part of the employee of the defendant and the negligent act was the proximate cause of the injury sustained by the plaintiff; that a reasonable and prudent person would have known or should have known that rough and turbulent weather would have likely reoccurred before plaintiff returned to her seat.

It follows from the above that the plaintiff is entitled to recovery for medical and hospital bills in the amount of $980.05, loss of wages $865.28, pain, suffering and permanent injury to ankle, $1,500.

Counsel will collaborate and prepare findings of fact and conclusions of law, together with a judgment, and present the same within 20 days from the date of the filing of this memorandum, allowing to the defendant the proper exceptions, and the clerk will enter an order accordingly.