**ARROW AVIATION, INC., a Corporation, Appellant,**

v.

**Harry H. MOORE and Socony Mobil Oil Co., a Corporation, Appellees.**

**No. 16137.**

United States Court of Appeals Eighth Circuit.

April 27, 1959.

Robert A. Barlow, Lincoln, Neb. (George Healey, Kenneth Cobb, Patrick W. Healey and Healey, Davies, Wilson & Barlow, Lincoln, Neb., were with him on the brief), for appellant.

C. Russell Mattson, Lincoln, Neb. (George L. Gordon and Carl A. Hummel, Kansas City, Mo., were with him on the brief), for appellee Harry H. Moore.

Before SANBORN, WOODROUGH, and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

Defendant appeals from judgment for plaintiff for damages sustained as a result of the crash of defendant's airplane in which plaintiff was riding as a fare-paying passenger. Jurisdiction based upon diversity of citizenship is established.

Plaintiff in his complaint asserted that defendant is an air transportation common carrier; that plaintiff engaged defendant to transport him by air from Lincoln, Nebraska, to Kansas City, Missouri; that the flight was made in defendant's Model 140 Cessna airplane; that plaintiff's injuries were brought about by the crash of defendant's airplane on a road adjoining the Kansas City airport; and that the crash was proximately caused by the negligence of

the defendant's pilot in the following particulars:

(a) The pilot failed to have the airplane under reasonable control;

(b) The pilot failed to keep a proper look-out;

(c) The pilot failed to reasonably apprise himself of the surface conditions and the wind and weather conditions as he approached said Airport;

(d) The pilot failed to land said airplane upon the runway of the Airport aforesaid;

(e) The pilot wrongfully landed said airplane upon a roadway adjacent to said Airport;

(f) The pilot wrongfully collided with the cyclone wire fence adjacent to said Airport;

(g) The pilot operated the airplane at too low an altitude for the wind, weather and surface conditions then existing, as he approached said Airport for his landing; and

(h) The pilot operated said airplane in such a manner as to have no regard for the safety, life or limb of his passenger, this plaintiff.

Defendant in its answer asserted that it was a private carrier, not a common carrier; denied all allegations as to negligence on the part of its pilot; and asserted that the accident was caused by an act of God, in that a sudden change in air currents occurred causing the plane to go out of control. A further defense to the effect that plaintiff chartered the plane and was in control thereof was also raised but was rejected by the trial court, and the defense is not asserted on this appeal.

The case was tried to a jury. The jury found for the plaintiff. The court overruled defendant's motion for a directed verdict made at the close of all the evidence and defendant's post-trial motion for judgment n. o. v. and entered judgment for the plaintiff in accordance with the verdict. Defendant asserts the court erred in denying its motion for a directed verdict, and that the court also erred in certain of its instructions.

We shall first consider defendant's contention that it was entitled to a directed verdict.

■ The court submitted to the jury for determination the question of whether the defendant is a common carrier or a private carrier. Whether an air carrier is a common carrier is determined by the same principles as are applied in the cases of carriers by other means. 6 Am.Jur. Aviation § 45; Annotation, 99 A.L.R. 173, 188. A carrier is a common carrier if it holds itself out to the public as willing to carry all passengers for hire indiscriminately. The holding out may be either by advertising or by actually engaging in the business of carriage for hire. See 13 C.J.S. Carriers § 530; 6 Am.Jur. Aviation § 47; Alaska Air Transport, Inc. v. Alaska Airplane Charter Co., D.C.Alaska, 72 F.Supp. 609; Meyer v. Rozran, 333 Ill. App. 301, 77 N.E.2d 454; Stoner v. Underseth, 85 Mont. 11, 277 P. 437.

■ The transportation contract here involved was made in Nebraska. In State ex rel. State Railway Commission v. Ramsey, 151 Neb. 333, 37 N.W.2d 502, 506, the court states:

"* * * A statute of this state defines common carriers as any corporation or other carrier engaged in the transmission of messages or transportation of passengers or freight for hire. S. 75–301, R.S. 1943. Common carriers by air are indistinguishable from other common carriers with respect to the policy of the law. Any person or organization engaged in transportation by air for hire is a common carrier."

There is ample evidence to support a jury finding that defendant is a common carrier. Defendant advertised in the Lincoln Telephone Directory that it provided nationwide air taxi service. Plaintiff called defendant in response to such advertisement and was furnished the air transportation here involved. Defendant was licensed by the Department of Commerce to carry on air taxi service.

Defendant in its report of the accident to the Civil Aeronautics Board reported the flight was an air taxi flight.

■ A common carrier by air is not an insurer of the safety of its passengers. Liability is based upon negligence. A common carrier by air must exercise the highest degree of care consistent with the practical operation of its plane for the safety of the passengers. Urban v. Frontier Air Lines, D.C.Wyo., 139 F. Supp. 288; Smith v. O'Donnell, 215 Cal. 714, 12 P.2d 933; Lundsford v. Tucson Aviation Corp., 73 Ariz. 277, 240 P.2d 545; 6 Am.Jur. Aviation § 51.

■ We now summarize the pertinent facts, bearing in mind that the evidence upon this appeal must be viewed in the light most favorable to the plaintiff.

The accident causing plaintiff's injuries occurred when the plane was attempting to land at the Kansas City, Missouri, airport. Torgeson, defendant's pilot, had considerable flight experience, but had never previously flown to the Kansas City airport and was not familiar with the ground lay-out there. Nothing unusual occurred on the flight from Lincoln, although rain squalls were encountered. The initial landing approach was from the north with the intention of landing on runway 18. When the plane got to within 50 feet of the runway, the pilot received a wave-off from the control tower and was told to come in on runway 21. The pilot flew the plane south across the airport, turned to the left, and approached runway 21 from the southwest in a normal manner. The wind at that time was south-southwesterly at 16 knots with gusts up to 24 knots. Visibility was good. The pilot testified that he knew the air was turbulent and that he had taken such turbulence into account and was making a power-on approach, flying to the runway at an air speed of 80 to 100 miles per hour, rather than gliding to a landing, as the power-on approach gives the pilot better control in turbulent air. He planned to land the plane in the first 200 feet of the runway. Runway 21 is 4800 to 5200 feet long. Not much

room is needed to land the type of plane here involved. The pilot testified:

"* * * To my way of thinking the approach under normal circumstances would have been all right. Then as we—just before we passed what I later learned was the railroad tracks, why we hit this down draft and just a second later we bounced off the road and through the fence and that was it."

Just before the crash the plane was at a height of about 40 feet above the tracks. The accident report signed by the pilot and defendant's president under "Pilot's Description of Accident" states in part:

"My conclusion is that the approach was too low for the wind and surface conditions, both of which I was not aware of. The airplane was caught in a strong down draft on the lee side of the dike and after passing just over the R. R. track experienced a *high speed stall* due to the up draft on the windward side of the dike. It is possible, too, that a strong gust could have subsided at this instant leaving the airplane completely stalled."

Upon cross-examination the pilot admitted that if he had planned to land about midway on the runway he would have experienced no trouble at all in landing. The pilot also testified that in a conversation with his employer's president about a week after the accident he was told that he should have come in higher, which fact the pilot said he already knew. The pilot also stated that his compensation for the flight was on the basis of $3 an hour, that he had not been paid for the trip, and that he had not asked for his compensation because of the accident.

The airport to the west of runway 21 is enclosed by a fence. Just west of the fence is the road upon which the plane crashed, and beyond that is a series of railroad tracks located upon a dike about 20 feet high. To the west of the tracks are grain elevators and other buildings.

Defendant takes the position that the wind condition which caused the crash was an act of God. In Cudney v. Braniff Airways, Inc., Mo., 300 S.W.2d 412, the Supreme Court of Missouri recognizes that a plane may drop in turbulent weather under circumstances where no negligence on the part of the pilot exists. The court then states (at page 417 of 300 S.W.2d):

"* * * But where science does afford or comes to afford a forewarning of a weather condition attended by the probability or reasonable likelihood of a hazard of dangerous turbulence, it would be too much to say that the airline need not anticipate and take the commensurate precautions reasonably available to guard against the hazard; and where the means or precautions, in given circumstances, of avoiding the hazard of dangerous turbulence are known or are pointed out in the evidence to have been available, as in our case, the failure to take such specific commensurate precaution or precautions, in our opinion, constitutes negligence. * * *"

The court then quotes with approval from Small v. Transcontinental & Western Air, 96 Cal.App.2d 408, 216 P.2d 36, as follows (at pages 417–418 of 300 S.W.2d):

"'It appears now to be common knowledge with regard to the operation of airplanes that downdrafts, which vary in effect according to their extent, are not uncommon. It is true that such a manifestation of nature, like the weather, is commonly referred to as an act of God. So far as the weather is concerned it cannot be denied that airplane operators take every precaution against weather hazards. *If it is possible to determine or even suspect that under certain conditions downdrafts are likely or possible, it would appear to be the duty of a prudent operator to take whatever precautions are necessary or available to guard against dangerous consequences.*'"

In the Cudney case plaintiff was injured when he was thrown from his seat when the plane in which he was riding plunged upon hitting a downdraft. The negligence charged was flying into a predicted storm without attempting to fly around it, and failure to reduce speed while flying into the storm.

The facts in the Cudney case are distinguishable from those in the present case, but the principles there stated and above quoted are applicable here. For other cases dealing with the duty of a pilot to anticipate the possibility of downdrafts and turbulent weather, see Northwest Airlines v. Glenn L. Martin Co., 6 Cir., 224 F.2d 120, 50 A.L.R.2d 882; Urban v. Frontier Air Lines, supra; Green v. Bankers Indemnity Ins. Co., D.C.W.D.La., 84 F.Supp. 504.

Defendant argues that flying, unlike automobile operation, is not within the general knowledge of laymen and is a subject that can be dealt with only by experts. It contends that the situation here is analogous to that prevailing in malpractice suits against physicians, and expert testimony is necessary to establish the required standard of care. The trial court, in its well-considered, unreported memorandum opinion, rejects defendant's contention, pointing out that no supporting cases were cited by defendant, and that the theory advanced by the defendant is opposed by 2 Harper and James, The Law of Torts, § 17.1, and Zinnel v. United States Shipping Board Emergency Fleet Corporation, 2 Cir., 10 F.2d 47.

Moreover, section 305.040, V.A.M.S., provides:

"The liability of the owner of one aircraft, to the owner of another aircraft, or to aeronauts or passengers on either aircraft, for damage caused by collision on land or in the air shall be determined by the rules of law applicable to torts on land."

In interpreting the foregoing statute, the Supreme Court of Missouri in Hough v. Rapidair, Inc., 298 S.W.2d 378, 382, states:

"In this case liability should be determined by the law of Missouri applicable to torts on land. Sections 305.040 and 305.050 R.S.Mo. 1949, V.A.M.S.; Uniform Aeronautics Acts, §§ 6 and 7, 11 U.L.A. at pages 163–164. The standard of care in this case is prescribed by the common law principles of negligence. * * * "

We are satisfied that the trial court correctly determined that the usual rules applicable to torts apply to aviation accidents, and there is no mandatory requirement that the standard of care be established by expert testimony.

 We believe that the evidence before us raises a fact issue of negligence on the part of defendant's pilot in the event the defendant is a common carrier. We also believe that a fact issue is created by the evidence in the event the defendant is only a private carrier. A private carrier owes a duty to its passengers to exercise ordinary care. Grimm v. Gargis, Mo., 303 S.W.2d 43.

In this case the defendant's pilot admitted that he observed the boundary fence, the cars on the railroad tracks, and the hangars on the field. The extensive buildings west of the tracks were also in plain sight. The pilot admitted that buildings and obstacles of this kind affect the air flow—the air has to go up and over them. Defendant places great reliance upon its assertion that the pilot was unaware of the 20 foot dike on which the tracks were located. There is substantial evidence to the effect that the height of ground structures can not be determined from the air when the plane is over 50 feet above the surface. The trial court in its memorandum opinion, overruling the motion for judgment n. o. v., states that the pilot was aware of the fact that the air over the field was turbulent, and that he knew if there was an obstruction, such as a dike, it would cause a downdraft. The court further observed that as the plane first passed over the air field, when the pilot planned a landing on runway 18, it would have been possible for him to observe the dike. Defendant's witness, Rice, a pilot who observed the accident, stated:

"The gusty condition of the wind, together with the various ground conditions, caused this turbulence. Some of the ground conditions are visible to a pilot. Hangars are visible and they contribute materially to the turbulence. A person knows how big hangars are."

This witness in a letter written shortly after the accident stated:

" * * * My best estimate of the cause of the accident was, first, a gusty condition not anticipated by the pilot and an improper recovery procedure following the encounter with the gusty condition. To the best of my recollection, power was not applied. However, I do not think the application of power would have been of any benefit as the aircraft at all times appeared to have more than ample flying speed for control and the runway was not over 75 yards from the point of impact."

Rice also stated that another plane landing on runway 21 shortly before defendant's plane had crashed had considerable difficulty landing, and would have crashed on the tracks if the pilot had not applied considerable power. The trial court states that it would have been possible for defendant's pilot to observe the dike when he made his approach to runway 18, and that it was a fact question for the jury whether the pilot was guilty of negligence in failing to observe the dike, and that there was also a fact question of whether defendant's pilot had failed to use proper recovery procedures. The court expressed the view that the fact that the pilot did not press his claim for wages was of some significance on the negligence issue.

We believe that the trial court was justified in its determination that a fact issue of negligence on the part of the pilot was presented by the evidence.

It appears to us that the justification for the submission of the negligence issue to the jury could have been based upon broader grounds. It is undisputed that the pilot knew of the air turbulence, and that he observed the hangars and railroad cars and knew that they could affect the air currents. As pointed out in the Cudney case, heretofore cited and quoted, downdrafts are not uncommon in turbulent weather. The pilot knew that he had to clear the railroad cars and the boundary fence in order to make a safe landing. He knew that because of the existing turbulence he could not make the usual glide-in landing and that a power-on landing was required. There is no reason why the pilot had to land on the first few hundred feet of the runway. Both the pilot and the defendant concede that the plane should have come over the dike at a higher altitude, and the pilot should have attempted the landing farther down on the runway. The specifications of negligence, heretofore set out, are broad. We believe that under all the circumstances of this case a jury question was presented on the issue of whether the pilot was exercising ordinary care in attempting his landing in the manner that he did. We hold that there was substantial evidence to support one or more of the specifications of negligence asserted, and that the court properly overruled defendant's motions for a directed verdict and for judgment n. o. v.

This leaves for consideration defendant's contention that the court erred in giving certain instructions.

The first instruction attacked is that submitting to the jury the eight specifications of negligence previously set out. The exception made to this instruction is:

"In the instruction which submitted the issues in the pleadings with reference to alleged specific acts of negligence of the defendant Arrow, the defendant Arrow excepts separately to the submission of each of the 8 such issues, on the ground that separately each is not supported by the evidence."

Defendant now contends that some of the specifications of negligence constitute allegations of general negligence, while in others specific acts of negligence are asserted, and that under Missouri law no recovery can be had for general negligence when specific negligence is alleged. Defendant also now urges that some of the specifications of negligence are in the nature of conclusions and not sufficient in themselves to support a cause of action.

The contentions now raised, which we have just set out, are not within the scope of the exception made to the instruction. Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the ground of his objection."

In Palmer v. Hoffman, 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645, the Supreme Court states:

" * * * In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error. Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial. * * * "

See also Palmer v. Miller, 8 Cir., 145 F. 2d 926, 930; Holliday v. Great Atlantic & Pacific Tea Co., 8 Cir., 256 F.2d 297, 301.

■ The trial court in its memorandum opinion states that it is very probable that it would not have submitted all of the specifications of negligence if the objection now urged had been timely

made as required by Rule 51. The court found that there was evidence to support the various specifications of negligence, and as a result the only exception properly made to the instruction was without merit. The defendant by failing to call the attention of the trial court to the errors it now urges, as required by Rule 51, has no right to have such asserted errors considered upon appeal.

Defendant's exception to the instruction submitting to the jury the issue of whether defendant was a private carrier or a common carrier is without merit. We have hereinabove expressed our view that there was evidentiary support for the submission of this issue.

 The parties are agreed that the standard of care to be exercised by private carriers is ordinary care. Defendant urges that the instructions place a greater burden than ordinary care upon a private carrier. Viewed as a whole, the instructions properly advised the jury that the obligation of a private carrier toward its passengers is to use ordinary care.

Defendant also urges the exception to the instruction concerning common knowledge of mankind with reference to downdrafts. This instruction properly states the Missouri law as established by the Cudney case, supra.

We have carefully examined all errors urged including those which we have not discussed. We are satisfied that the trial court committed no prejudicial error.

In order to terminate this controversy, we have chosen to decide it on the merits. It is doubtful that any final appealable judgment was entered by the District Court upon the verdict of the jury, although the parties have assumed that there was such a judgment. It is also doubtful that any adequate notice of appeal was filed. The fact that we have ruled upon the merits of the controversy is not to be taken or understood to mean that we approve of the procedure followed by the defendant in bringing the case to this Court or that we are passing upon the sufficiency of such procedure to entitle the defendant to a review of the case.

Plaintiff's motion to dismiss the appeal upon the grounds that the appeal was not docketed on time and that the supersedeas bond filed does not comply with the applicable rules is overruled.

The judgment appealed from is affirmed.