[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellants Timothy Boger and Gordon Air Management (collectively "appellants") have appealed the judgment of the Summit County Court of Common Pleas in favor of appellees/cross-appellants Edward and Marianne Salisbury, Bill and Barbara Nobley, and Jerry and Jo An Sanders (collectively "appellees") on their negligence claim.[1] This Court affirms.
 I. Facts
On January 16, 1995, appellees Edward Salisbury, Bill Nobley and Jerry Sanders chartered a private flight from Canton-Akron Airport to Lancaster, Pennsylvania, aboard a Cessna 310 airplane that was co-owned by appellee Jerry Sanders and leased to and managed by appellant Gordon Air Management ("Gordon Air"). Appellant Timothy Boger was employed by Gordon Air as a pilot and was the pilot-in-command of the January 16, 1995 flight. Prior to the flight, Boger had conducted the required pre-flight inspection, excluding the plane's deicing equipment, and had obtained a weather report for the area of their projected travel. Upon reviewing this report, Boger determined that the flight would proceed and the four men boarded the plane shortly before 8:00 a.m.
After taking off, the plane ascended to a cruising altitude of 9,000 feet. At approximately 8:30 a.m., Boger and the passengers of the aircraft noticed that the plane was accumulating ice on its wings and tail. Boger engaged the deicing equipment and the left wing deicing boot removed most of the accumulated ice on that wing. However, the deicing boot on the right wing malfunctioned and ice continued to build on the wing. Boger then requested and was given permission to descend to a lower altitude. After descending to 7,000 feet, the plane continued to accumulate ice and Boger was given permission to descend to 5,000 feet. Boger then noticed a "buffet," an aviational term indicating that the plane was about to "stall," which meant that the aircraft was losing its aerodynamic capabilities. All of the passengers noticed that the craft was shaking and that it seemed as if it were requiring more power in order to stay in flight. Boger's attempts to change altitudes to escape the icing conditions were unsuccessful and ice continued to build on the right wing and tail of the aircraft. Also, because the right wing's deicing boot had failed, ice built at a higher rate on the right wing than on the left wing. Boger then requested permission to land at an alternate airport. The air traffic controller informed Boger that the closest airport was approximately twelve miles from their location and that the Clarion, Pennsylvania airport was located approximately eighteen miles away. Boger chose to attempt to land the airplane at the Clarion airport.
As they began their descent, the ice continued to accumulate, the plane was noticeably shuddering, and the engines sounded strained. When Boger lowered the landing gear, the right wing of the plane dipped sharply downward, requiring Boger to increase the power on the right side and pull the yoke to the left. This caused the left wing to dip, and the plane yawed violently from left to right. Boger managed to keep the plane from spinning out of control. The plane, however, was coming in too fast and too high to land on the runway. As a result, Boger attempted to point the nose of the plane downward in an attempt to put the craft on the ground. The right wing of the plane hit the ground first, causing the plane to begin to flip toward the left and bringing the left wing into contact with the runway. The small craft then began spinning down the runway before becoming airborne again, then violently crashing back into the ground and coming to rest in a ravine.
During the crash, Salisbury's seat became dislodged and, upon the plane coming to a rest, Salisbury was unconscious in his seat on top of Nobley, pinning Nobley into his seat. Boger and Sanders, both of whom had suffered head injuries, were unconscious in the front seats of the plane. Nobley was able to revive Salisbury and help him remove his seatbelt. The men then noticed that the wings of the plane were on fire, that the door was wedged closed, and that they were trapped inside the burning craft. They forced the door of the plane open and crawled to safety. Shortly thereafter, emergency rescue units arrived and took the passengers of the mangled wreckage to the hospital.
On November 27, 1996, Salisbury and Nobley filed suit for personal injuries against appellants and appellee Sanders in his capacity as owner of the plane. Sanders then filed a cross-claim against appellants for his personal injuries. Prior to trial, the claim against Sanders was voluntarily dismissed and the matter proceeded to trial against Gordon Air and Boger. During the course of the trial, appellees intended to call an expert witness on airplane accident reconstruction to testify pertaining to the cause of the crash. Appellants moved to exclude the testimony, arguing that, because the witness was not a pilot, he was not qualified to testify as to what a reasonable person in Boger's position would have done. The trial court agreed and excluded the testimony. Appellants moved for a directed verdict at the close of appellees' case and again upon the close of all the evidence, arguing that appellees had failed to present any expert testimony to explain the requisite standard of care. The trial court overruled the motions and the case proceeded to the jury. After its deliberations, the jury returned a verdict in favor of appellees. The trial court then entered judgment upon the jury's verdict.
Appellants timely appealed, asserting two assignments of error.
 II. Assignments of Error Assignment of Error No. I THE TRIAL COURT ERRED IN DENYING THE MOTION OF [APPELLANTS]
 FOR DIRECTED VERDICT WHERE [APPELLEES] FAILED TO PRESENT EVIDENCE ON EACH ELEMENT OF THEIR CLAIMS.
In their first assignment of error, appellants argue that the trial court erred in denying their motions for a directed verdict at the close of appellees' case and at the close of all the evidence. Specifically, appellants aver that, because appellees failed to present expert testimony pertaining to the standard of care in their case in chief and failed to rebut appellants' expert prior to the close of the case, the appellees did not establish the standard of care necessary for the jury's consideration. Therefore, appellants conclude, the trial court should have granted appellants' motions for a directed verdict. This Court disagrees.
Under Civ.R. 50(A), a defendant may move for a directed verdict at the close of a plaintiff's case in chief and at the close of all the evidence. Because the decision to grant or deny a motion for a directed verdict involves a question of law, this Court must review the trial court's decision de novo. Nichols v.Hanzel (1996), 110 Ohio App.3d 591, 599. The standard that is employed is clear:
 In ruling on a directed verdict — or, in our case, considering such a ruling on appeal — a court must construe the evidence most strongly in favor of the non-moving party and determine whether reasonable minds can come to but one conclusion on the evidence submitted, that conclusion being adverse to the non-moving party. If reasonable minds can reach different conclusions, the matter must be submitted to a jury. The court considers the motion without weighing the evidence or determining the credibility of witnesses. A motion for a directed verdict raises a question of law because it examines the materiality of the evidence rather than the conclusions to be drawn from the evidence. Thus, the court does not determine whether one version of the facts presented is more persuasive than another; rather, it determines whether only one result can be reached under the theories of law presented in the complaint.
(Citations omitted.) Cox v. Oliver Machinery Co. (1987), 41 Ohio App.3d 28,29.
In the instant case, appellees alleged in their complaint both negligence per se and negligence. Setting aside the former theory of the case momentarily, this Court notes that, in order to demonstrate the latter theory of negligence, appellees were required to prove four things: "that [appellants] owed [appellees] a duty, that [appellants] breached that duty, that [appellees] suffered harm and that the harm was proximately caused by [appellants'] breach of duty." Cooperider v. Peterseim (1995),103 Ohio App.3d 476, 479. "`Duty' is generally a question of law; `breach of duty,' `proximate cause,' and `damages' are generally questions of fact." Ricciardo v. Weber (Dec. 22, 1989), Licking App. No. CA-3452, unreported.
Appellants first argue that, although appellees were required to present expert testimony pertaining to the requisite standard of care, they failed to do so. Appellants argue over appellees' objections that the appropriate standard of care is not the degree of care that an ordinary person would have exercised, but rather the degree of care that a reasonable pilot would have exercised. This Court agrees with this last contention. See Fisher v.Watkins (July 18, 1990), Montgomery App. No. CA 11963, unreported (noting that the appropriate standard in a mid-air collision case is the "degree of care that a reasonable pilot would exercise under the same circumstances.").
This Court disagrees, however, with appellant's assertion that expert testimony was required to establish the degree of care that a reasonable pilot would have exercised under the same circumstances. Appellants cite numerous cases for the proposition that expert testimony was required because appellees' claims were based upon a standard of care that was not readily understandable by a lay jury. However, the cases appellants rely upon stand for the general proposition that expert testimony is admissible where the issues involve questions that are not within the common knowledge of the lay jury; these cases do not explicitly require
expert testimony. In fact, this Court has found no authority from the courts of Ohio to answer the question of whether expert testimony is required to establish the applicable standard of care for a pilot.
Often, unless a matter is within the comprehension of a layperson, expert testimony is indeed necessary. See Evid.R. 702 and 703. Experts have the knowledge, training and experience to enlighten the jury concerning the facts and their opinion regarding the facts. McKay Machine Co. v. Rodman (1967), 11 Ohio St.2d 77,81. Therefore, while it is indeed true that under the "common knowledge exception," "matters of common knowledge and experience, subjects which are within the ordinary, common and general knowledge and experience of mankind, need not be established by expert opinion testimony," Ramage v. Central OhioEmergency Serv., Inc. (1992) 64 Ohio St.3d 97, 103, this Court finds that the issues in the case sub judice do not fall within this exception. The operation of an airplane under these facts and the degree of care related to such an activity are beyond the common knowledge of a layperson. This is not to say, however, that appellees failed to present evidence satisfying their burden. Although the question of what a reasonable pilot would do under the same circumstances lies outside the province of the layperson, and although it is certainly the better practice to present expert testimony as to this standard of care, the circumstances of this particular case indicate that such expert testimony was not required. See Arrow Aviation, Inc. v. Moore (C.A.8, 1959),266 F.2d 488, 493 (stating that "the usual rules applicable to torts apply to aviation accidents, and there is no mandatory requirement that the standard of care be established by expert testimony."). Rather, this Court's review of the record reveals that evidence was introduced at trial that established the foregoing elements to be proved, beginning with the standard of care.
Appellees argue that the standard of care was established in part by the introduction of plaintiffs' exhibit 90, which includes certain federal aviation regulations. Appellants claim that exhibit 90 was not admitted by the trial court and, as a result, cannot be considered by this Court. However, a review of the record clearly indicates that this exhibit was admitted by the trial court and was properly before the jury for its consideration. This exhibit was a copy of Section 91.527, Title 14, CFR ("the regulation"), which provides:
 (b) Except for an airplane that has ice protection provisions that meet the requirements in section 34 of Special Federal Aviation Regulation No. 23, or those for transport category airplane type certification, no pilot may fly —
 Under IFR into known or forecast moderate icing conditions[.]
In regard to FAA regulations, this Court has found a dearth of case law in the courts of this state as to whether such a regulation establishes the standard of care for a reasonable pilot. However, state statutory law and persuasive authority on the federal level indicate that the regulations do establish the standard of care of a reasonable pilot in this state.
In Freeman v. United States (1975), 509 F.2d 626, the Sixth Circuit Court of Appeals explained that "the federal air regulations have been adopted by the State of Ohio as its own. Thus, violation of a federal air regulation constitutes a violation of Ohio law and is, under appropriate circumstances, negligence per se." (Citations omitted.) Id. at 630; see, also, R.C.4561.05 and 4561.14; Bibler v. Young (1974), 492 F.2d 1351, 1359. The Sixth Circuit further reasoned that, "[i]f an injury caused by an action which violates a safety statute is of the kind that the statute was intended to prevent, the action constitutes negligenceper se." (Citation omitted.) Freeman, supra, at 630. This Court agrees that Ohio has adopted the federal air regulations, which encompasses adoption of the specific regulation involved herein, and that such regulations establish the standard of care. See Abdullah v.American Airlines, Inc. (C.A.3, 1999), 181 F.3d 363, 364-365 (holding that the standard of care for pilots is federally preempted); Dyerv. United States (C.A.9, 1987), 832 F.2d 1062, 1069 (noting that the FAA regulations, information manuals, and FAA circulars "constitute evidence of the standard of care among all pilots."). However, because this Court concludes that appellees had established ordinary negligence on the part of appellants, the issue of whether appellants' conduct constituted negligence per se need not be addressed. As such, this Court expresses no opinion as to whether violation of the federal regulation constitutes negligence per se in light of the Supreme Court of Ohio's holding that "the violation of an administrative rule does not constitute negligence per se; however, such a violation of an administrative rule may be admissible as evidence of negligence." Chambers v. St. Mary's School (1998),82 Ohio St.3d 563, 568.
Having determined that the federal regulation establishes the standard of care, this Court now addresses whether appellees should have introduced expert testimony both to explain that standard and to show a breach of that standard. This Court holds that, given the testimony adduced at trial, expert testimony was not required in either instance.
At the beginning of their case in chief, appellees called Gordon as a witness as if on cross-examination. During the course of his testimony, Gordon, a certified pilot, stated that the aircraft in question had not been certified to be flown in icing conditions. Further, Gordon testified concerning a SIGMET that had been issued:
 Q: Mr. Gordon, on the screen is a SIGMET that I believe was for the morning of the 16th. Did you see that before?
A: Yes, I did.
 Q: Do you agree that was the SIGMET applicable to that portion of Mr. Boger's flight warning of January 16, 1995?
A: Yes, it does cover part of his flight plan.
* * *
 Q: This SIGMET would indicate, in laymen's terms, that there is, Occasional severe rime/mixed ICGIG, 30-180 reported by aircraft. Conditions continuing beyond 1330Z"; is that correct?
A: Yes, I see that. Yes.
* * *
 Q: And it indicates reported by aircraft. That means that pilots were actually telling the weather service that there was rime icing and mixed icing occurring in this area?
[objection made and overruled]
 Q: So when it says aircraft reporting, it's telling us that pilots have been experiencing this?
 A: Somebody somewhere in that area has made a report, yes.
 Q: And that's not a forecast, that's something that someone actually went through?
A: That is correct.
 Q: And it says continuing beyond 1330Z. That means rime icing back at 8:30 in the morning?
A: Conditions continuing beyond 8:30 in the morning.
 Q: There is no prediction how much beyond 8:30 in the morning?
A: No.
* * *
 Q: Now, is it your position that flying into forecasted icing is correct under the FAA?
 A: Ice, yes. Ice is forecasted in northern Ohio — if you went by forecasted icing you would be on the ground half the days of the year.
 Q: Is it your position that flying into severe icing, forecasted icing is permissible under the FAA?
 A: I would not fly into severe forecasted icing if I had to go through it.
Gordon's own testimony indicated that known icing conditions existed. Such testimony contradicted the deposition testimony of Boger, which was read into the record prior to the close of appellees' case in chief. During the course of the deposition, the following exchange took place between appellees' counsel and Boger:
 Q: First of all, Mr. Boger, with regard to your preparation and planning for this flight before you even got off the ground on departure from Akron, was it ever your intention or plan to fly this aircraft into known icing conditions?
 A: No, I had no plan to take this aircraft into known icing conditions.
 Q: You were aware that the weather service through the facility that you used was forecasting icing in certain locations at certain times?
A: Yes.
 Q: Was it your plan not to fly into any known icing conditions?
A: That's correct.
 Q: After takeoff and on your climbout, * * * you had conversation with Cleveland center, the ATC controller at that time on the subject of reports of icing.
A: Yes.
 Q: Okay. At the conclusion of your discussion with him, did you receive any information that indicated to you that you would be flying into known icing conditions?
 A: No. I even clarified, are there any pilot reports, and he said, no pilot reports, something to that effect.
Therefore, Boger contradicted Gordon's testimony that there had been a report of known icing while at the same time admitting that there existed a forecast of icing. Earlier in his deposition testimony, Boger explained the weather forecast as follows:
 Q: Would it be accurate that the weather service was warning pilots that rime icing was a possibility?
A: It's an accurate summation.
 Q: Are there different rankings of the risk of rime icing —
* * *
A: There are different icing rankings.
Q: Tell me what they are.
A: Light, moderate, severe.
 Q: Does that MDT [a code in the weather report], does that stand for moderate?
* * *
A: Yeah. Moderate to isolated severe, yes.
 Q: Okay. And did that warning apply to the area that you were flying in that day?
A: Yes.
* * *
Q: So that warning would also apply to you?
A: Yes.
Reviewing the testimony of both Gordon and Boger, then, including other contradictory exchanges not reproduced here, this Court finds that there was conflicting testimony as to whether known or forecast icing conditions existed. Not disputed was the fact that the plane lacked the type of certification contemplated in the regulation establishing the standard of care. Boger admitted several times in his deposition that, from his pre-flight inspection of the plane, he knew that the plane was not certified to fly into icing conditions. His initial testimony stated:
 Q: Before taking off, what was your understanding as to the deicing capabilities of the Cessna 310?
 A: That it was not prohibited from flying into known icing.
Q: Where did you get that understanding?
A: Flight operating handbook, better known as POH.
Q: Who generated the POH?
A: Aircraft manufacturer.
Boger's testimony again reached the issue of whether he understood the aircraft's ability to operate in icing conditions:
 Q: Are you familiar with the fact that airplanes have a certification in order to fly into known icing conditions?
* * *
A: Correct.
Q: Do you know what that certification is called?
A: Specifically, no.
 Q: Do you know if the Cessna 310 you were flying on January the 16th had a certification to be flown into known icing conditions?
A: Yes, I do know.
Q: Did it have that certification?
A: No, it did not.
 Q: Did you know on the morning of January 16, 1995 that the plane did not have the certification to be flown into icing conditions?
A: Yes.
 Q: And so that I understand your position, is it your testimony that flying a plane that is not certified to be flown into icing conditions is not prohibited by anything?
A: We're going to have to take that question apart.
 Q: I'll reask the question. You indicated that it is — let me ask it another way. Is there any prohibition that you know of to flying a Cessna 310 into known icing conditions?
A: According to the manual, no.
 Q: Is there any prohibition from any source of flying a Cessna 310 into icing conditions?
 A: There may be that I'm not aware of. This is what I had to work with that day.
 Q: Okay. I just want to make sure. I think I've asked this, but I want to make sure the record is clear. You knew that this plane was not certified to fly into icing conditions on the morning of January 16th, 1995?
A: Yes.
 Q: How did you know the status of that aircraft as far as being certified to flying into icing conditions or not?
 Let me ask it another way. Where did you learn that the plane was not certified to be flown into icing conditions?
 A: Because it wasn't stamped anywhere that this aircraft is approved for flight into icing conditions.
Q: So you knew that from your own inspection?
A: Correct.
Therefore, although Boger stated that he believed that the aircraft manual did not prohibit the plane from flying into icing conditions, he admitted both that he was aware that the plane lacked the requisite certification for such operation and that there may be other sources that prohibited this operation; Boger stated, however, that he was not aware of any source containing such a prohibition — despite testimony by Sanders presented in appellees' case in chief that a pilot is required to be familiar with the federal regulations, which would include the regulation introduced as exhibit 90. Boger further admitted to being "a little more concerned" than at other times about the weather and explained that he was concerned about "[t]he weather, which was icy."
Finally, Boger admitted that he was unaware of the location of the closest airport at which he could land, even after being informed of the respective locations of the two closest airports:
 Q: [W]hose choice was it not to go to Du Bois [airport] and go to Clarion County [airport] instead?
 A: It really wasn't a — we didn't really concentrate on either one of them. I was asking for the nearest airport and
 I think at the time I was under the impression that Clarion was a little closer.
* * *
 Q: [Cleveland Center communicated] that Du Bois airport is 11:00 and 12 miles, is that correct?
A: Gotch ya. Yes.
 Q: Okay. And then, and I'm paraphrasing, you discussed the weather with central, Cleveland, you indicate that you're getting a rough ride, and then they tell you that Clarion is 18 miles away. Can you explain to me why you went to Clarion as compared to Du Bois 12 miles away?
A: Well, counselor, I was a little busy at the time.
 And this is again what I was getting at with the assistance of Cleveland or Clarion radar at the time. They were not very helpful in getting me to the nearest airport.
 Yeah, I agree with you, you look at the numbers, without a doubt Du Bois was closer. 12 is smaller than 18 without a doubt. I can't tell you why I decided to go for Clarion except that I thought it was closer at the time. But I was under a lot of pressure right about this time right now.
In summary, this Court finds that the record indicates that the proper standard of care was presented to the jury. Appellants' own admissions, taken in conjunction with the federal regulation introduced into evidence, established both the standard of care and the breach thereof. Although there was conflicting testimony elicited from the witnesses, the jury had before it the federal regulation prohibiting the conduct involved and evidence that there was, at a minimum, a weather forecast of severe rime and mixed icing in the geographical region of the flight plan, as well as some evidence indicating that there had been actual reported icing.[2] Additional evidence reflects that Boger clearly knew that the aircraft was not certified to fly under in icing conditions and that Boger continued to fly the plane for at least thirty minutes under these icing conditions with malfunctioning deicing equipment before requesting permission to land at an alternate airport. Upon being granted such permission, Boger chose to bypass the closest airport and instead decided to fly an additional six miles under these conditions to the Clarion, Pennsylvania airport where the crash occurred. Although Gordon testified in the defense's case that Boger's conduct was at all times reasonable and prudent, such testimony is not conclusive as to whether the standard of care had been breached in light of the foregoing admissions. Accordingly, because evidence of the appropriate standard of care was before the jury, and because reasonable minds could have reached different conclusions as to whether a violation of that standard of care had occurred, the matter was properly submitted to a jury. Accordingly, the first assignment of error is not well taken.
 Assignment of Error No. II THE TRIAL COURT ERRED IN ENTERING JUDGMENT ON THE JURY'S
 VERDICT AS THE EVIDENCE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellants argue in their second assignment of error that the verdict of the jury was against the manifest weight of the evidence. In addressing a challenge to the weight of the evidence, this Court:
 must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Otten (1986), 33 Ohio App.3d 339, 340. This Court has previously explained that "[a] reviewing court should not second-guess the trier of fact's conclusion as to the weight and credibility of the evidence presented." Howd v. Truett (July 8, 1998), Summit App. No. 18648, unreported. As such, this discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Otten, supra, at 340. Further, a judgment is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact. SeeState v. Gilliam (Aug. 12, 1998), Lorain App. No. 97CA006757, unreported.
Upon review of the evidence previously recounted in connection with the first assignment of error and of the remaining portions of the record, this Court cannot say that the jury clearly lost its way so as to produce a manifest miscarriage of justice. Accordingly, the second assignment of error is also not well taken.[3] Given this Court's resolution of appellants' assignments of error, this Court need not address appellees' cross-assignments of error. See App.R. 12(A)(c).
 III. Conclusion
The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellants/Cross-Appellees.
Exceptions.
DONNA J. CARR, FOR THE COURT
CACIOPPO, J. CONCURS
[1] Subsequent to oral argument, appellants and appellees/cross-appellants Jerry and Jo An Sanders filed a joint "notice of partial dismissal entry," thereby removing the Sanders as parties to this appeal.
[2] In addition to Gordon's testimony, Plaintiffs' Exhibit 12 indicates that other aircraft had reported rime and mixed icing in this area which may have been an indication of known icing conditions.
[3] In the introductory paragraphs to both their assignments of error, appellants contend that appellees failed to prove that the injuries suffered in the instant case were proximately caused by appellants' alleged breach. However, appellants' arguments then focus on whether the standard of care and any breach thereof were established. Because appellants fail to argue the point as required, this Court need not reach the issue of proximate cause. See App.R. 12(A)(2) and 16(A)(7).